AMERICAN HERITAGE AGENCY, INC., ET AL. *v.*
RITA GELINAS ET AL.
(AC 19854)

Foti, Spear and Dranginis, Js.

Argued January 8—officially released April 10, 2001

*Louis I. Parley*, for the appellant (named defendant).

*Andrea A. Hewitt*, with whom was *John M. Wolfson*, for the appellees (plaintiffs).

*Opinion*

FOTI, J. The defendant Rita Gelinas[1] appeals from the judgment rendered in favor of the plaintiffs, American Heritage Agency, Inc., and William Gelinas,[2] after a trial to the court. On appeal, the defendant claims that the trial court improperly (1) found that the plaintiff was the sole owner of American Heritage Agency, Inc., (2) concluded that the plaintiff's exhibit 6A, which consisted of certain minutes of a shareholders' and directors' meeting, was an authentic document, (3) rendered judgment in favor of the plaintiff despite the plaintiff's unclean hands, (4) concluded that the defendant was not the sole owner of American Heritage Agency, Inc., and (5) disqualified attorney Mark Rosenblit from representing the defendant. We affirm the judgment of the trial court.

The court reasonably could have found the following facts. Prior to his marriage and while still in high school, the plaintiff worked with his father in Putnam for his family's catering business, American Heritage Agency. The plaintiff served in the Korean War and, upon his return, discovered that his mother had sold the family's catering business.

---

[1] The other defendants in this action are Mark Rosenblit and Gertrude Irwin. On March 2, 1999, however, the plaintiff withdrew the action as to Rosenblit and Irwin. Accordingly, we refer in this opinion to Rita Gelinas as the defendant.

[2] Because William Gelinas brought this action on behalf of himself and American Heritage Agency, Inc., we refer to him as the plaintiff.

In 1954, the plaintiff married the defendant. Between 1954 and 1963, both parties worked. The plaintiff taught school during the day and worked nights for a railroad. The defendant worked as a secretary for a local manufacturer. Prior to 1963, the parties engaged in several business endeavors together that involved buying property from which they derived rental income.

In 1963, the parties decided to focus their careers on a wedding catering venture, which encompassed everything from the invitations to planning vacations. The parties also continued to manage their rental properties. That same year, the parties formed a corporation called Bee Gee's, Inc., as an umbrella for their activities.[3] The plaintiff had his attorney, F. Owen Egan, prepare the corporate papers that were filed with the secretary of state on September 3, 1963. The corporate papers listed the plaintiff as president and treasurer, the defendant as vice president and secretary, and Egan as assistant treasurer.

The defendant operated the office while the plaintiff brought in business and made property acquisitions. Between 1963 and 1970, the parties started to refer to the corporation as American Heritage Agency and later changed the name of the corporation from Bee Gee's, Inc., to American Heritage Agency, Inc., in 1970. The parties expanded the corporation to include a travel agency and other businesses such as a school lunch program caterer in East Hartford and a Sealtest distributorship.

In 1970, when the parties amended the certificate of incorporation changing the corporate name from Bee Gee's, Inc., to American Heritage Agency, Inc., they failed to file a certificate of dissolution for Bee Gee's,

[3] The corporation also was known as B.G.'s, Inc., because the plaintiff decided to shorten the name from Bee Gee's. The initials B and G stood for Bill Gelinas.

Inc., with the secretary of the state's office. In 1979, the publishers of American Heritage books threatened to sue American Heritage Agency, Inc., over the use of its name. In response to that threat, the plaintiff asked attorney Eddie Zyko to set up a new corporation called Heritage Windjammer, Inc. Additionally, the plaintiff took back the name Bee Gee's, Inc., in place of the name American Heritage Agency, Inc.[4] Nevertheless, once the plaintiff's attorney advised him that he could resume using the name American Heritage Agency, he filed the dissolution papers for Bee Gee's, Inc., on December 20, 1979. Between 1979 and 1989, the corporate names Heritage Windjammer, Inc., and American Heritage Agency, without the "Inc.," were used together. The names were listed together on letterhead and income tax returns. In 1980, by corporate resolution, Heritage Windjammer, Inc., changed its name back to American Heritage Agency, Inc. In 1989, the name of the corporation was changed from Heritage Windjammer, Inc., to American Heritage Agency, Inc.[5]

Over the years, the parties amassed a total of twenty-seven pieces of real property located in Connecticut and New Jersey. The properties were valued in excess of $7 million and generated annual income of up to $500,000. Sometime between 1978 and 1979, the parties experienced marital difficulties when the defendant became aware that the plaintiff was involved in an extramarital relationship. The parties remained married, however, and continued their business relationship. In 1992, the plaintiff discovered that he had colon cancer. He was quite ill and thought that he was going to die.

---

[4] The plaintiff did so because counsel advised him that it would minimize exposure to a potential lawsuit in which the American Heritage Publishing Company threatened to sue American Heritage Agency over the use of the name American Heritage.

[5] It should be noted that the name change was complete in 1980; however, the name change was not filed with the secretary of the state's office until 1989.

As a result, in 1992, he transferred all of his property interests to the defendant. He would not have divested himself of his property interests if he did not believe that he was dying.

In December, 1992, the parties mutually agreed on a divorce. After the divorce, however, the parties continued to live together under the same arrangement that they had prior to the divorce and after suffering marital difficulties in the late 1970s. On August 18, 1993, the defendant executed her last will and testament, which left everything to the plaintiff.

The parties continued to live together until 1995, when the defendant locked the plaintiff out of the family home and the business office of American Heritage Agency, Inc. The defendant told the plaintiff that he did not die as expected and that she could not stand him any longer.

After she locked the plaintiff out of their home and office, the defendant received notice that one of the New Jersey properties was experiencing financial difficulties and that a bankruptcy proceeding was looming. The defendant contacted attorney Ronald Glick, who had handled a previous bankruptcy proceeding for the parties in New Jersey. In August or September, 1995, Glick took on representation of American Heritage Agency, Inc., at the defendant's request. The defendant told Glick that she owned American Heritage Agency, Inc. Prior to 1995, Glick had dealt with either the plaintiff or Brenda McLean, a part-time worker whose job was to find tenants for the property.

Because the defendant had locked the plaintiff out of the home and the business office, the plaintiff no longer had access to documents concerning the various corporate entities that he had arranged. The plaintiff brought the present action on behalf of himself and American Heritage Agency, Inc., when the defendant began holding herself out as the sole owner of American

Heritage Agency, Inc. From its inception, the parties used American Heritage Agency, Inc., as a vehicle for receiving and disbursing income from their property management activities. The parties placed money into American Heritage Agency, Inc., to pay salaries associated with their business activities.

Documents evidencing ownership of American Heritage Agency, Inc., include minutes of a shareholders' and directors' meeting dated March 1, 1989, minutes of a special meeting of the shareholders dated October 5, 1995, and resolutions of the board of directors dated October 6, 1995.

Over the years, the defendant had not objected to the corporations that the plaintiff formed or to the fact that he was the sole owner of those corporations. She did not object because their money was not in the corporations, but, rather, it was in the properties that they owned jointly and individually.

The defendant submitted only one document in support of her alleged ownership of American Heritage Agency, Inc. That document was in the form of minutes of a special meeting of the shareholders of American Heritage Agency, Inc., electing herself as a director and making herself the sole shareholder. Only the defendant had signed the minutes of the October 6, 1995 meeting. No other documentation supported the defendant's representation as to her sole ownership of American Heritage Agency, Inc.

On the basis of those facts, the court concluded that the plaintiff was the sole owner of American Heritage Agency, Inc. Thereafter, the court enjoined the defendant from holding herself out to be either an officer or director of American Heritage Agency, Inc., and from exercising or purporting to exercise any control over American Heritage Agency, Inc., its proceeds, funds or assets. The court further ordered that the defendant

render a full and accurate accounting of American Heritage Agency, Inc., for the period of time in which she exercised or purported to exercise control over it. Additional facts will be provided as needed.

I

The defendant claims that the record does not support the court's conclusion that the plaintiff was the sole owner of American Heritage Agency, Inc. We disagree.

"Our analysis begins with the appropriate standard of review. We have long held that a finding of fact is reversed only when it is clearly erroneous. See, e.g., *Poulos* v. *Pfizer, Inc.*, 244 Conn. 598, 616, 711 A.2d 688 (1998). A factual finding is clearly erroneous when it is not supported by any evidence in the record or when there is evidence to support it, but the reviewing court is left with the definite and firm conviction that a mistake has been made. Id. Simply put, we give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses." (Internal quotation marks omitted.) *Hartford Electric Supply Co.* v. *Allen-Bradley Co.*, 250 Conn. 334, 345–46, 736 A.2d 824 (1999).

The defendant claims that her proof that the parties jointly owned American Heritage Agency, Inc., controverts the court's conclusion that the plaintiff was the sole owner of the corporation. The defendant argues that her testimony and documentary evidence established that the parties were joint owners. Specifically, the defendant relies on two stock certificates dated May 1, 1970, that indicate that the plaintiff and the defendant each owned fifty shares of American Heritage Agency, Inc. We are not persuaded.

The defendant essentially asks this court to retry the case and to evaluate the credibility of witnesses and

the weight of the evidence. We do not engage in this type of review. See *Hoye* v. *DeWolfe Co.*, 61 Conn. App. 558, 562, 764 A.2d 1269 (2001). "[W]here the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. That is the standard and scope of this court's judicial review of decisions of the trial court. Beyond that, we will not go." (Internal quotation marks omitted.) Id. The defendant urges us to look at previous stock certificates from American Heritage Agency, Inc., but ignores the fact that that corporation was dissolved on December 31, 1979.[6]

The court relied on the minutes of the shareholders' and directors' meeting of American Heritage Agency, Inc., dated March 1, 1989, that stated that the plaintiff was the sole owner of the corporation. The court found that the defendant's signature on the 1989 minutes was genuine. Moreover, Zyko, who set up American Heritage Agency, Inc., in 1979 at the plaintiff's direction, testified that he understood that the plaintiff was the sole owner of the corporation. The court found the defendant's evidence unpersuasive, specifically, the minutes of a special meeting of the shareholders dated October 6, 1995, which stated that she was the sole shareholder of American Heritage Agency, Inc. After our review of the record, we conclude that it contains evidence that supports the court's conclusion that the plaintiff was the sole owner of American Heritage Agency, Inc.[7]

---

[6] "Pursuant to General Statutes § 33-291 (c), a corporation, once formed, exists until it is dissolved in accordance with the provisions of the Stock Corporation Act; General Statutes § 33-282 et seq.; until it is extinguished through a valid merger pursuant to General Statutes § 33-369, or, if it is of limited duration, until a date set forth in its articles of incorporation." *Fink* v. *Golenbock*, 238 Conn. 183, 203–204, 680 A.2d 1243 (1996).

[7] The defendant also argues in support of her claim that (1) the July 5, 1979 calligraphic stock certificate is a falsified document, (2) the printed

## II

The defendant next claims that the court improperly determined that the plaintiff's exhibit 6A, which consists of an original copy of the March 1, 1989 minutes of the shareholders' and directors' meeting of American Heritage Agency, Inc., was an authentic document. Specifically, the defendant claims that the signatures on that document, with the exception of the plaintiff's, were not genuine. The defendant argues that the court could not make its determination of the authenticity of the signature on the basis of the credibility of the parties' handwriting experts.

The following additional facts are required for our resolution of this claim. At trial, the parties presented testimony from handwriting experts on the question of the authenticity of the defendant's signature on the March 1, 1989 minutes of American Heritage Agency, Inc. The defendant's expert, Ana Kyle, testified that the signature of the defendant on that document was not authentic. The plaintiff's expert, Clarissa DeAngellis, testified that the signature was authentic.

The defendant disagrees with the court's factual findings and requests that we consider the evidence and

"Heritage Windjammer, Inc." stock certificate is a spurious document, (3) the testimony of attorney Eddie Zyko that he thought the plaintiff was the owner of Heritage Windjammer does not establish that the plaintiff was the owner, (4) the plaintiff's exhibit of a shareholders' and directors' meeting dated March 1, 1989, was a falsified document and (5) the plaintiff admitted in his 1992 deposition, in an unrelated matter, that he did not own or have anything to do with the operation of American Heritage Agency, Inc., and the plaintiff should be held to that admission. As stated in the text of this opinion, the defendant's arguments implicate the trial court's role as fact finder. The defendant essentially argues that the court should have adopted her version of the facts. As stated previously, our review of the record reveals evidence that supports the court's decision. We cannot retry the facts or pass upon the credibility of the witnesses. See *Aetna Casualty & Surety Co.* v. *Pizza Connection, Inc.*, 55 Conn. App. 488, 491, 740 A.2d 408 (1999).

reach a different conclusion. "It is fundamental appellate jurisprudence that an appellate court does not retry the case and substitute its judgment for that of the trial court. *Malmberg* v. *Lopez*, 208 Conn. 675, 679, 546 A.2d 264 (1988). Rather, it is the function of the Appellate Court to determine whether the decision of the trial court is clearly erroneous." *Century Mortgage Co.* v. *George*, 35 Conn. App. 326, 329–30, 646 A.2d 226, cert. denied, 231 Conn. 915, 648 A.2d 150 (1994).

" 'It is undisputed that where an issue is raised regarding the authenticity of a writing, proof of authenticity may be made by a comparison of the disputed writing with another writing, an exemplar, the authenticity of which has been established. *Shakro* v. *Haddad*, 149 Conn. 160, 163, 177 A.2d 221 (1961); *Tyler* v. *Todd*, 36 Conn. 218, 222 (1869). The authenticity of the exemplar may be proved by circumstantial evidence. McCormick, Evidence (3d Ed.) § 222; annot., 41 A.L.R.2d 575, 589 § 8.' *State* v. *Jones*, 8 Conn. App. 177, 184, 512 A.2d 932 (1986). 'In general, a writing may be authenticated by a number of methods, including direct testimony, circumstantial evidence or proof of custody. [2 C. McCormick, Evidence (4th Ed. 1992)] §§ 219 through 228, pp. 38–58.' *New England Savings Bank* v. *Bedford Realty Corp.*, 246 Conn. 594, 604, 717 A.2d 713 (1998)." *Churchill* v. *Allessio*, 51 Conn. App. 24, 34, 719 A.2d 913, cert. denied, 247 Conn. 951, 723 A.2d 324 (1998).

Here, the court found that the signature on the March 1, 1989 minutes was that of the defendant. The court found that the plaintiff had no reason to forge his signature or to have the defendant's signature forged on the 1989 minutes. The court found the testimony of the plaintiff's certified document examiner to be more credible than the testimony of the defendant's examiner. The court also found that, with regard to business decisions, the defendant acquiesced to whatever the plaintiff suggested. The defendant's sole business input

involved what property they should purchase. On the basis of our review of the record, we conclude that the evidence supports the court's finding that the defendant's signature on the March 1, 1989 minutes was authentic and that that finding was not clearly erroneous.

### III

The defendant next claims that the court improperly rendered judgment in favor of the plaintiff despite the defendant's defense of unclean hands. We disagree.

The following additional facts are necessary for our resolution of the defendant's claim. The defendant filed a counterclaim, alleging, inter alia, that the plaintiff had interfered with the operation of American Heritage Agency, Inc., by filing false corporate reports and fraudulently claiming to be an officer, director or shareholder of the corporation. In response, the plaintiff denied that he had engaged in any fraudulent activity in relation to the present case and raised nine special defenses to the defendant's counterclaim.

"Our jurisprudence has recognized that those seeking equitable redress in our courts must come with clean hands. The doctrine of unclean hands expresses the principle that where a plaintiff seeks equitable relief, he must show that his conduct has been fair, equitable and honest as to the particular controversy in issue. *Bauer* v. *Waste Management of Connecticut, Inc.*, 239 Conn. 515, 525, 686 A.2d 481 (1996). For a complainant to show that he is entitled to the benefit of equity he must establish that he comes into court with clean hands. . . . The clean hands doctrine is applied not for the protection of the parties but for the protection of the court. . . . It is applied . . . for the advancement of right and justice. . . . *McCarthy* v. *McCarthy*, 55 Conn. App. 326, 335, 752 A.2d 1093 (1999), cert. denied, 252 Conn. 923, 752 A.2d 1081 (2000). One who

seeks to prove that he is entitled to the benefit of equity must first come before the court with clean hands. . . . The party seeking to invoke the clean hands doctrine to bar equitable relief must show that his opponent engaged in wilful misconduct with regard to the matter in litigation. . . . The trial court enjoys broad discretion in determining whether the promotion of public policy and the preservation of the courts' integrity dictate that the clean hands doctrine be invoked. . . . *Polverari* v. *Peatt*, 29 Conn. App. 191, 202, 614 A.2d 484, cert. denied, 224 Conn. 913, 617 A.2d 166 (1992). . . .

"This view is consistent with the decision of our Supreme Court in *Orsi* v. *Orsi*, 125 Conn. 66, 69–70, 3 A.2d 306 (1938). In that case, the court stated: The maxim [that he who comes into equity must do so with clean hands] only applies to the particular transaction under consideration, for the court will not go outside the case for the purpose of examining the conduct of the complainant in other matters or question his general character for fair dealing. The wrong must be done to the defendant himself and must be in regard to the matter in litigation." (Citations omitted; internal quotation marks omitted.) *Thompson* v. *Orcutt*, 59 Conn. App. 201, 205–206, 756 A.2d 332, cert. granted on other grounds, 254 Conn. 934, 761 A.2d 758 (2000).

Here, the court expressly found that the plaintiff did not forge the documents that the defendant claims were fraudulent. Indeed, the court found that the defendant's signature on the March 1, 1989 minutes was authentic. The court found that the defendant had failed to meet her burden of proof. After our review of the record, we conclude that the court properly refused to apply the doctrine of unclean hands based on the facts that it found, which are supported by the record.

## IV

The defendant next claims that the court improperly concluded that she was not the sole owner of American Heritage Agency, Inc. We disagree.

We already have held in part I of this opinion that the court did not improperly conclude that the plaintiff was the sole owner of American Heritage Agency, Inc. As previously stated in part I, the record supports the court's conclusion that the plaintiff was the sole owner of American Heritage Agency, Inc. Therefore, the court did not improperly conclude that the defendant was not the sole owner of the corporation.

## V

Finally, the defendant claims that the court acted improperly when it disqualified attorney Rosenblit from representing the defendant. We disagree.

The following additional facts are necessary for our review of the defendant's claim. The plaintiff originally named Rosenblit as a defendant in the present case, and Rosenblit represented himself pro se while he was a party to the proceeding. During the trial, however, the plaintiff withdrew the complaint against Rosenblit. Thereafter, Rosenblit filed an appearance on behalf of the defendant. At that time, attorney Louis Parley, who continued to represent the defendant, already represented her. On July 21, 1999, the plaintiff filed a motion to disqualify Rosenblit from representing the defendant on the ground that Rosenblit previously had represented the plaintiff in other matters. The plaintiff claimed that Rosenblit's representation of the defendant violated rules 1.7[8] and

---

[8] Rule 1.7 of the Rules of Professional Conduct provides: "Conflict of Interest: General Rule

"(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

"(1) The lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

"(2) Each client consents after consultation.

"(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

"(1) The lawyer reasonably believes the representation will not be adversely affected; and

1.9[9] of the Rules of Professional Conduct. On August 30, 1999, the court granted the plaintiff's motion to disqualify Rosenblit. The court found that Rosenblit had developed a close relationship with both the plaintiff and the defendant over a substantial period of time. The court found that Rosenblit had represented the plaintiff on numerous occasions during which time the plaintiff considered Rosenblit to be his attorney. Moreover, during the divorce proceeding, Rosenblit refused to represent the defendant because of a conflict of interest.

The court also found that the defendant had other counsel present during the entire proceeding and that, therefore, Rosenblit's disqualification would not prejudice her. The court found that Rosenblit's past relationship with the plaintiff, coupled with the fact that the defendant already had representation in the present case, provided a sufficient basis for disqualification.

"The Superior Court has inherent and statutory authority to regulate the conduct of attorneys who are officers of the court. . . . We accord wide discretion to a trial court's ruling on a motion for disqualification of counsel for conflict of interest. . . . In determining whether the trial court abused its discretion, we indulge every reasonable presumption in favor of the correct-

"(2) The client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved."

[9] Rule 1.9 of the Rules of Professional Conduct provides: "Conflict of Interest: Former Client

"A lawyer who has formerly represented a client in a matter shall not thereafter:

"(1) Represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation; or

"(2) Use information relating to the representation to the disadvantage of the former client except as Rule 1.6 would permit with respect to a client or when the information has become generally known."

ness of the court's decision." (Citations omitted; internal quotation marks omitted.) *Fiddelman* v. *Redmon*, 31 Conn. App. 201, 210, 623 A.2d 1064, cert. denied, 226 Conn. 915, 628 A.2d 986 (1993).

"Disqualification of counsel is a remedy that serves to ' "enforce the lawyer's duty of absolute fidelity and to guard against the danger of inadvertent use of confidential information." ' *Silver Chrysler Plymouth, Inc.* v. *Chrysler Motors Corporation*, 518 F.2d 751, 754 (2d Cir. 1975). In disqualification matters, however, we must be 'solicitous of a client's right freely to choose his counsel'; *Government of India* v. *Cook Industries, Inc.*, 569 F.2d 737, 739 (2d Cir. 1978); mindful of the fact that a client whose attorney is disqualified may suffer the loss of time and money in finding new counsel and 'may lose the benefit of its longtime counsel's specialized knowledge of its operations.' Id. The competing interests at stake in the motion to disqualify, therefore, are: (1) the [plaintiff's] interest in protecting confidential information; (2) the [defendant's] interest in freely selecting counsel of [her] choice; and (3) the public's interest in the scrupulous administration of justice. *Goldenberg* v. *Corporate Air, Inc.*, 189 Conn. 504, 507, 457 A.2d 296 (1983), overruled in part, *Burger & Burger, Inc.* v. *Murren*, 202 Conn. 660, 522 A.2d 812 (1987).

"Rule 1.9 of the Rules of Professional Conduct governs disqualification of counsel for a conflict of interest relating to a former client. The rule states that: 'A lawyer who has formerly represented a client in a matter shall not thereafter: (a) Represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation; or (b) Use information relating to the representation to the disadvantage of the former client except as Rule 1.6 would permit with respect to a client or when the information has become generally known.'

"Rule 1.9 (a) expresses the same standard that we had applied under the Code of Professional Responsibility when a claim of disqualification based on prior representation arose. Thus, an attorney should be disqualified if he has accepted employment adverse to the interests of a former client on a matter substantially related to the prior representation. *State* v. *Jones*, [180 Conn. 443, 449, 429 A.2d 936 (1980), overruled in part, *State* v. *Powell*, 186 Conn. 547, 442 A.2d 939 (1982), cert. denied sub nom. *Moeller* v. *Connecticut*, 459 U.S. 838, 103 S. Ct. 85, 74 L. Ed. 2d 80 (1982)]. This test 'has been honed in its practical application to grant disqualification only upon a showing that the relationship between the issues in the prior and present cases is "patently clear" or when the issues are "identical" or "essentially the same." *Government of India* v. *Cook Industries, Inc.*, [supra, 569 F.2d 739–40].' [*State* v. *Jones*, supra, 449]; see also *State* v. *Bunkley*, 202 Conn. 629, 652, 522 A.2d 795 (1987). Once a substantial relationship between the prior and the present representation is demonstrated, the receipt of confidential information that would potentially disadvantage a former client is presumed. *Goldenberg* v. *Corporate Air, Inc.*, supra, [189 Conn. 512]; *State* v. *Jones*, supra, 450.

"Unlike Canon 9 under the Code of Professional Responsibility, however, the Rules of Professional Conduct do not expressly state that a lawyer should avoid the appearance of impropriety. Even when Canon 9 was applicable, we rejected the notion that an 'appearance of impropriety' was alone a sufficient ground for disqualifying an attorney. In *State* v. *Jones*, supra, [180 Conn. 452–53], we stated that 'the appearance of impropriety alone is "simply too slender a reed on which to rest a disqualification order except in the rarest of cases." *Board of Education of the City of New York* v. *Nyquist*, 590 F.2d 1241, 1247 (2d Cir. 1979).' See also *State* v. *Bunkley*, supra, [202 Conn. 653–54]. Although

considering the appearance of impropriety may be part of the inherent power of the court to regulate the conduct of attorneys, it will not stand alone to disqualify an attorney in the absence of any indication that the attorney's representation risks violating the Rules of Professional Conduct." *Bergeron* v. *Mackler*, 225 Conn. 391, 397–400, 623 A.2d 489 (1993).

On the basis of our review of the record, we conclude that the court did not abuse its discretion when it disqualified Rosenblit. The court properly relied on its finding that the plaintiff had an interest in protecting confidential information that Rosenblit had acquired during the course of his past representation of the plaintiff. The court found that the relationship was "close" and "substantial." The court's finding of a substantial and close relationship entitled it to presume that Rosenblit's representation would disadvantage the plaintiff. Moreover, the court also found that disqualifying Rosenblit did not harm the defendant's interest in selecting counsel of her own choice because she already had an attorney whom she had freely chosen, and who had represented her in the proceedings. Therefore, the court did not abuse its discretion when it disqualified Rosenblit.

The judgment is affirmed.

In this opinion the other judges concurred.