CADLE COMPANY *v.* GARY R. GINSBERG
(AC 21130)

Foti, Bishop and Shea, Js.

Argued April 1—officially released July 9, 2002

*Paul N. Gilmore,* with whom, on the brief, was *Barbara A. Frederick,* for the appellant (substitute plaintiff).

*William F. Gallagher,* with whom, on the brief, was *Hugh D. Hughes,* for the appellee (defendant).

BISHOP, J. In this collection action to enforce a negotiable promissory note, the substitute plaintiff, CadleRock Joint Venture, L.P.,[1] appeals from the judgment of the trial court rendered in favor of the defendant, Gary R. Ginsberg. The plaintiff claims that the court improperly (1) denied its motions to direct a verdict in its favor, to set aside the verdict for the defendant and to render judgment for the plaintiff notwithstanding the verdict, (2) charged the jury regarding the plaintiff's burden of proof on its status as a holder in due course, (3) submitted the construction of certain documents to the jury as a question of fact and (4) restricted the plaintiff's cross-examination of a defense witness. Because we conclude that the court improperly denied the plaintiff's motion for a directed verdict, we reverse the judgment of the trial court.

The following facts were found by the court in *Cadle Co.* v. *Ginsburg*, 51 Conn. App. 392, 721 A.2d 1246 (1998), cert. denied, 247 Conn. 963, 724 A.2d 1125 (1999), a related action brought by the Cadle Company against Robert A. Ginsburg, the defendant's nephew.[2] "In the late 1980s, [Robert Ginsburg and Gary Ginsberg[3] were shareholders] of Delco Development Company, Inc. (Delco), a real estate development company that was adversely affected by the collapse of the state's real estate market. See *Mechanics & Farmers Savings Bank, FSB* v. *Delco Development Co.*, 232 Conn. 594, 656 A.2d 1034, cert. denied, 516 U.S. 930, 116 S. Ct. 335, 133 L. Ed. 2d 235 (1995).

---

[1] CadleRock Joint Venture, L.P., the substitute plaintiff in this action, was assigned the note by Cadle Company, the original plaintiff. We refer in this opinion to CadleRock Joint Venture, L.P., as the plaintiff.

[2] Because both cases arose from the same set of circumstances, the facts found in *Cadle Co.* v. *Ginsburg*, supra, 51 Conn. App. 392, reasonably could have been found by the jury in the present action.

[3] Gary R. Ginsberg and Robert A. Ginsburg, although related, spell their last names differently.

"On September 14, 1988, Delco borrowed $2 million from Great Country Bank (Great Country) and executed a promissory note in that amount payable to Great Country.[4] On the same date, three Delco shareholders, [Robert Ginsburg], Gary Ginsberg and Dennis Nicotra, signed agreements of guarantee and suretyship.

"In April, 1991, Great Country filed an action against [Robert Ginsburg] and Gary Ginsberg. The complaint alleged that Delco had defaulted on its note and sought monetary damages against the defendants. Nicotra was not named as a defendant in the action. On July 24, 1991, Nicotra executed a satisfaction agreement with a number of creditors, including Great Country. Delco was not a party to that agreement, in which Nicotra promised to transfer a number of his assets, including his Delco stock, to the creditors. In return, the creditors released Nicotra from various obligations. Great Country specifically released Nicotra 'from any further liability as a guarantor' [on the Delco debt] and agreed, with certain limitations, to indemnify him with respect to any claim for contribution by other guarantors.

"On the same day, July 24, 1991, the creditors who had settled with Nicotra, including Great Country, signed an intercreditor agreement to divide the assets obtained in the settlement. Neither Delco nor Nicotra were parties to that agreement. Settlement negotiations between opposing counsel in the action by Great Country against [Robert Ginsburg] and Gary Ginsberg commenced in the fall of 1991. Great Country had not informed [Robert Ginsburg] or Gary Ginsberg of its agreement with Nicotra. [Robert Ginsburg and Gary Ginsberg] ultimately agreed to settle the case by executing [promissory notes] . . . .

---

[4] Delco borrowed the $2 million to pay Mechanics & Farmers Savings Bank, FSB, the accrued interest on a first mortgage secured by real property in Hamden.

"On October 11, 1991, [Robert Ginsburg and Gary Ginsberg each] executed a promissory note in the amount of $100,000, payable to Great Country. . . . In return for the . . . $100,000 note[s] . . . Great Country filed a withdrawal of its action." *Cadle Co.* v. *Ginsburg*, supra, 51 Conn. App. 393–94.

The defendant learned about the settlement and the terms of the satisfaction agreement several months after he executed the promissory note. Thereafter, he made no payments on the note. Great Country transferred the note to Cadle Company on April 6, 1994. The note was part of a pool of approximately 106 loans that Cadle Company purchased from Great Country.

Cadle Company filed the present action to enforce the note in 1995.[5] The defendant conceded that he had made no payments on the note, but asserted the special defenses of accord and satisfaction, breach of the implied covenant of good faith and fair dealing, and fraudulent misrepresentation,[6] all related to Great Country's settlement with Nicotra. Cadle Company denied the special defenses, and asserted in avoidance its rights as a holder in due course and release. The note was thereafter assigned to the plaintiff. See footnote 1.

In March, 2000, the case was tried to a jury. At the close of the evidence, the plaintiff filed a motion seeking a directed verdict in its favor. After the court denied the motion, the parties agreed to stipulate that the plaintiff had made a prima facie case that it was a holder of the note, and that the defendant had not paid the note according to its terms. The court then submitted the case to the jury. The jury found in favor of the plaintiff in its case-in-chief, as it was directed to do by order of the court pursuant to the parties' stipulation, found in favor of the defendant on all three special

[5] The operative complaint is the amended complaint dated August 12, 1999.

[6] The defendant also alleged two other defenses that were not submitted to the jury.

defenses, and found against the plaintiff on the matters raised in avoidance of the special defenses. The jury returned a verdict in favor of the defendant. The court denied the plaintiff's motions to set aside the verdict and for judgment notwithstanding the verdict. This appeal followed.

I

The plaintiff claims that there was no evidentiary basis for findings in the defendant's favor on his three special defenses. The plaintiff, therefore, claims that the court improperly denied its motion for a directed verdict, and its subsequent motions to set aside the verdict and for judgment notwithstanding the verdict. We agree.

"The standard of review applied to directed verdicts is clear. A directed verdict is justified if, on the evidence the jury reasonably and legally could not have reached any other conclusion. . . . In reviewing the trial court's decision to [reject the plaintiff's motion for a directed verdict in its favor] we must consider the evidence in the light most favorable to the [defendant]. . . . While it is the jury's right to draw logical deductions and make reasonable inferences from the facts proven . . . it may not resort to mere conjecture and speculation. . . . The standard of review governing a motion for judgment notwithstanding the verdict is the same because a motion for judgment notwithstanding the verdict is not a new motion, but the renewal of a motion for a directed verdict." (Citations omitted; internal quotation marks omitted.) *Gagne* v. *Vaccaro*, 255 Conn. 390, 400, 766 A.2d 416 (2001).

Each of the defendant's three special defenses was based on the claim that Great Country's settlement with Nicotra had fully satisfied the Delco debt. The first special defense alleged that Nicotra had satisfied the entire Delco debt with the transfer of his assets pursu-

ant to the satisfaction agreement, thus discharging the defendant from his liability as a guarantor. The second special defense alleged that Great Country had violated the covenant of good faith and fair dealing by inducing the defendant to execute the $100,000 promissory note in settlement of the Delco debt without first disclosing that it had settled the debt with Nicotra. The third special defense alleged that Great Country had fraudulently induced the defendant to execute the $100,000 promissory note after settling the debt with Nicotra.

At trial, a number of documents relating to the special defenses were admitted into evidence, including the Delco note, the defendant's guarantee of the Delco note, the satisfaction agreement, the intercreditor agreement and the $100,000 promissory note executed by the defendant. The documentary evidence showed that the satisfaction and intercreditor agreements involved fifteen creditors in addition to Great Country. Pursuant to the satisfaction agreement, Nicotra transferred most of his assets, consisting primarily of real property, to the creditors holding first priority mortgages. Nicotra's guarantor liability on the Delco debt, however, was an unsecured obligation. The satisfaction agreement addressed the unsecured creditors by transferring some of Nicotra's assets, which were substantially encumbered, to a lead bank for the benefit of all of the creditors. The agreement included a provision acknowledging that the transferred assets would be dealt with in a separate document known as the intercreditor agreement. Great Country received no direct remuneration from Nicotra in exchange for his release as a guarantor of the Delco note. Instead, each of the unsecured creditors obtained participation rights in a so-called creditors pool comprised of the transferred assets.

According to schedule 1.1 of the satisfaction agreement, Nicotra's entire debt obligation to Great

Country at the time the agreement was signed was $2,222,472.18 on the Delco note, a subordinate mortgage of $434,031.64 on a separate property and an unsecured loan of $274,683.99, for a total obligation of $2,931,187.81. Section ten of the intercreditor agreement indicated that Nicotra's unsecured debt to the lenders was $22,888,500.11 and that Nicotra's $2.9 million total obligation to Great Country constituted 12.81 percent of that amount. The intercreditor agreement thus granted Great Country, as a participating unsecured creditor, a 12.81 percent participation right in any of the proceeds that might be realized from liquidation of the assets in the creditors' pool.

The overall purpose of the satisfaction agreement was "to provide for the satisfaction, restructuring, modification and compromise of such obligations . . . upon the terms and conditions contained [in] this Agreement." Section 3.02 (c) of the agreement provided, with respect to the $2 million Delco debt, that compliance with the agreement's terms constituted "good and adequate consideration for the release of Borrower [Nicotra] from any further liability as a guarantor of the obligations secured by said second mortgage, and hereby releases Borrower from any further liability therefor, and agrees to indemnify and hold Borrower harmless from any and all liability with respect to any claim for a right of contribution by any of the other Guarantors of or obligors of said obligations . . . ."

Section 4.01 of the agreement stated that "[e]xcept as otherwise provided . . . nothing contained herein shall be deemed a limitation on the rights of any Lender against any other party liable for any of the obligations."

Section 6.17 of the satisfaction agreement referred to the intercreditor agreement, and stated that "[t]he Borrower . . . understand[s] and acknowledge[s] that the Lenders have entered into an Intercreditor

Agreement of even date herewith providing for, among other things, the division and distribution of amounts available for payment of the Obligations. The *Borrower . . . consent[s] to such Intercreditor Agreement,* including, without limitation, all payments and transfers among the Lenders thereunder and any and all future modifications and amendments thereof . . . ." (Emphasis added.)

Section 14 of the intercreditor agreement addressed how the release of Nicotra might affect the other Delco guarantors. It stated: "In reaching this Intercreditor Agreement, the indebtedness of Delco Development Corporation to [Mechanics & Farmers Savings Bank, FSB, holder of the first mortgage on the Delco property] and Great Country, which was guarantied by the Borrower and by Robert A. Ginsburg and Gary R. Ginsberg (the 'Ginsbergs'), was treated as debt of the Borrower for the purposes of this Agreement. [Mechanics & Farmers Savings Bank, FSB] and Great Country have agreed actively to pursue recovery of such indebtedness by taking all reasonable or necessary actions pursuant to the Ginsbergs' guaranties (which may include the commencement of legal proceedings) and by paying all costs arising therefrom until such time as they shall determine in their reasonable business judgment after due investigation that further such action is not justified. . . ."

The defendant's guarantee of the Delco debt also was entered into evidence. Paragraph eight of that agreement provided: "The liability of the Undersigned [Gary Ginsberg] hereunder is direct, absolute and unconditional, without regard to the liability of any other person. The Bank shall have the right to proceed against the Undersigned [Gary Ginsberg] immediately upon any default by the Principal [Delco Development Company, Inc.] and shall not be required to take any action or proceeding of any kind against the Principal

or any other party liable for the indebtedness or any collateral or security which the Bank may have before proceeding against the Undersigned hereunder. The Undersigned shall have no right of subrogation, reimbursement, or indemnity whatsoever or any right or recourse to the collateral for the indebtedness of the Principal to the Bank, unless and until all of the indebtedness have been paid in full."

Paragraph ten of the guarantee agreement further provided: "Each of the Undersigned expressly agrees that its obligations and liabilities hereunder shall in no way be released, lessened, or impaired by reason of the release of, or the unenforceability of this Agreement against, any one or more of the others of the Undersigned or by the release of, or unenforceability of any Agreement or undertaking against any other guarantor or other party liable, whether primarily or secondarily, for the repayment of the indebtedness."

At trial, several witnesses testified as to whether the intent or effect of Nicotra's settlement with Great Country was to satisfy the entire Delco debt. The defendant was the only witness to testify that, after he read the satisfaction agreement, he interpreted it to mean that Nicotra had settled the entire debt and that no additional payments by the other guarantors would be required. He did not point, however, to any factual basis for that conclusion. He also conceded that the effect of § 3.02 (c) of the agreement was to release only Nicotra from his obligation on the debt and that the language of the agreement put the other guarantors "on notice" of a potential action against them.

Edward Rosenblatt was involved in negotiating the satisfaction and intercreditor agreements as legal counsel for Great Country. He testified that the agreements were intended to be read together and that their purpose was to maximize the creditors' recovery on Nicotra's

debts. In that regard, he pointed to the "affirmative obligation" of Great Country, under § 14 of the intercreditor agreement, actively to pursue the other guarantors of the Delco debt.

Thomas Lenahan, who also participated in the negotiations, was vice president of Great Country when the agreements were drafted. He testified that the defendant's guarantee of the Delco note expressly permitted the bank to pursue all of the guarantors and that the bank had been motivated to do so to maximize its recovery. Robert Hirtle, Nicotra's attorney, explained that one of his chief concerns when negotiating the agreement had been to protect Nicotra from actions for contribution by the other guarantors. Nicotra testified that he had been motivated to negotiate the satisfaction agreement by a desire to protect his own financial interests.

Substantial testimony was elicited as to how much money, if any, Great Country received, or was expected to receive, pursuant to the settlement. None of the witnesses, including the defendant, Nicotra, Rosenblatt, Lenahan and Hirtle, had any personal knowledge as to what happened to the transferred assets after the agreements were signed. Accordingly, none could say whether any of the assets had been liquidated. All gave considerable testimony, however, regarding their expectations as to the creditors' potential recovery from the asset pool.

Although Nicotra acknowledged that the satisfaction agreement showed that his liabilities exceeded the value of his transferred assets by more than $22 million, he nonetheless testified that he always had perceived the value of the transferred properties to be in excess of his liabilities because the properties were "good from an earnings standpoint," despite the weak real estate market at the time. Nicotra did not refer to any specific

facts to support that conclusion. Rosenblatt, on the other hand, testified that Great Country believed Nicotra's assets were insufficient to satisfy his liabilities. As a result, the bank believed that the most equitable solution for all concerned was to participate in an agreement with Nicotra's other creditors. Rosenblatt stated that he did not think that the bank expected the entire debt obligation to be satisfied, and that he personally believed that the bank would be "very lucky" to receive any funds at all from the asset pool.

Lenahan testified that he was responsible for obtaining up-to-date appraisals of Nicotra's properties and had concluded that the value of the transferred assets was such that there would be a shortfall of some magnitude when compared to Nicotra's liabilities. He explained that the only additional sources of recovery on the Delco note were the other two guarantors and that the bank had hired Rosenblatt to bring an action against the defendant because it had not yet recovered any payments on the note. In fact, when Lenahan left the bank for another position one year after the agreement was signed, Great Country still had not recovered any proceeds from the transferred assets.

Hirtle testified as to Nicotra's cash flow problems with the properties, all of which were located in Connecticut, except a resort property in the Caribbean. Hirtle explained that a cash flow approach was used to value the properties. This required a determination of how much debt could be supported by the net operating income each property generated. Hirtle stated that he did not trust appraisals because property values were rapidly falling at the time and banks in the state were failing. He believed that the cash flow approach had a "more solid accounting basis" and would provide a more accurate assessment of the properties' true value. He also testified that there were a few "premium" properties for which buyers might pay more and a few that

might yield less than indicated by the cash flow analysis. Hirtle identified the Caribbean resort and several properties in the "General Electric portfolio" as premium properties.

Hirtle further testified that six months before the intercreditor agreement was signed, a potential buyer had offered $18 million for the Caribbean resort. The buyer wanted the resort free and clear of Nicotra's unsecured debt on the property, which was significant,[7] and demanded an assumption of the first mortgage. When Nicotra was unable to liquidate his unsecured debt and the Bank of Nova Scotia, holder of the first mortgage, refused to accede to the buyer's demand, the deal fell through. Hirtle testified that the first mortgage on the Caribbean property was approximately $4 million to $4.5 million, and that its sale might have yielded $14 million in proceeds for the creditors' pool. Thereafter, the Gulf War intervened as the lenders were preparing to sell the property, and, because of drastically reduced tourism, the season was a financial disaster. As a result, the lenders did not, or could not, put up the working capital needed to keep the resort financially afloat, and the Bank of Nova Scotia foreclosed approximately six months after the satisfaction agreement was signed. At the same time, cash flow dropped on the General Electric properties in Connecticut because of falling rental income, and General Electric foreclosed on those properties. Hirtle testified that to his knowledge, the only funds that went into the creditors' pool were derived from Nicotra's classic car collection, which he estimated was worth approximately $400,000.[8]

[7] Note six to schedule 201 (a) of the satisfaction agreement indicates that at the time the agreement was signed, the first mortgage was $2 million and the total debt on the property was $8,552,000, of which Nicotra personally had guaranteed $8,042,000. The schedule also indicates that Nicotra had estimated the value of the Caribbean property at $12.4 million, rather than $18 million.

[8] Schedule 201 (a) of the satisfaction agreement lists a value for the classic car collection of $228,000.

Because the special defenses required the jury to interpret the provisions of several agreements, we must be guided not only by the standard of review applied to directed verdicts, but also by principles of contract law. "A contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms." (Internal quotation marks omitted.) *Short* v. *Connecticut Bank & Trust Co.*, 60 Conn. App. 362, 367, 759 A.2d 129 (2000). Accordingly, our task is to determine whether the terms of the relevant documents, together with the testimonial evidence as to the circumstances surrounding their negotiation, provided a sufficient evidentiary basis for the jury to have found in favor of the defendant on any of the three special defenses.

A

In his first special defense, accord and satisfaction, the defendant alleged that Nicotra had settled the entire Delco debt for good and valuable consideration, thus discharging the defendant of his liability as a guarantor.[9]

---

[9] The first special defense alleged as follows: "Prior to the entering into the Note relationship between the parties to this action, defendant and co-obligors ROBERT GINSBURG and DENNIS NICOTRA were indebted to GREAT COUNTRY BANK in the amount of $2,000,000.00. GREAT COUNTRY BANK, without disclosing to defendant and ROBERT GINSBURG settled said debt obligation for good and valuable consideration. GREAT COUNTRY BANK thereafter induced defendant and ROBERT GINSBURG to enter in a settlement as memorialized by the execution of NOTES. The plaintiff knew or should have known of said prior facts during the course of review and due [diligent] investigation of the loan file prior to purchasing same. The

We conclude that the evidence was insufficient to support a jury finding in favor of the defendant on that ground.

"When there is a good faith dispute about the existence of a debt or about the amount that is owed, the common law authorizes the debtor and the creditor to negotiate a contract of accord to settle the outstanding claim. . . . An accord is a contract under which an obligee promises to accept a stated performance in satisfaction of the obligor's existing duty. . . . Upon acceptance of the offer of accord, the creditor's receipt of the promised payment discharges the underlying debt and bars any further claim relating thereto, if the contract is supported by consideration." (Citations omitted; internal quotation marks omitted.) *B & B Bail Bonds Agency of Connecticut, Inc.* v. *Bailey*, 256 Conn. 209, 212, 770 A.2d 960 (2001).

Considering the evidence in the light most favorable to the defendant, as we are required to do, we conclude that the jury reasonably and legally could not have found in favor of the defendant on the first special defense. First, the language of the relevant agreements provides no basis for a finding that they constituted a full and final settlement of the Delco debt. The defendant conceded as much when he agreed with the plaintiff's counsel that § 3.02 (c) of the satisfaction agreement provided only for a release of Nicotra from future liability on the debt. The defendant also conceded that by indemnifying and holding Nicotra harmless with respect to potential claims for a right of contribution by the other guarantors, the agreement put the other guarantors on notice of a potential action against them. Moreover, § 4.01 of the satisfaction

plaintiff assumes all liabilities of the prior holder in due course of said debt instrument GREAT COUNTRY BANK. The alleged debt was paid in full by DENNIS NICOTRA to the favor [of] GREAT COUNTRY BANK and consequently there has been an Accord and satisfaction of the debt . . . ."

agreement specifically provided that nothing contained in the agreement should be deemed a limitation on the rights of any lender against parties liable for the obligations described therein. In addition, the effect of § 6.17 of the agreement was to incorporate the provisions of the intercreditor agreement, which expressly anticipated that Great Country would pursue the other guarantors of the Delco debt. Finally, all of the foregoing provisions were consistent with the defendant's guarantee of the Delco note. That agreement described the defendant's liability on the note as direct, absolute and unconditional, without regard to the liability of any other person, and not subject to release by reason of the release of or unenforceability of the note against any other guarantor.

Second, there was no testimonial evidence from those who negotiated and drafted the satisfaction and intercreditor agreements that the agreements were intended to effect a full and final settlement of the Delco debt. Rosenblatt testified that the purpose of the agreements was to maximize the recovery on Nicotra's debts. Rosenblatt specifically pointed to the provision in the intercreditor agreement regarding Great Country's pursuit of the other guarantors of the Delco note. Lenahan also testified that the bank had expected to pursue the other guarantors, and Nicotra testified that his primary concern when negotiating the settlement was to protect his own financial interests.

Third, the agreements indicated that there was insufficient value in the transferred properties to satisfy the Delco debt because Nicotra's liabilities exceeded his assets by $22 million. Although Nicotra testified that he believed the value of the transferred properties exceeded his liabilities, he pointed to no specific facts to support his opinion, which was therefore of no probative value. He also acknowledged that the agreements showed the existence of a significant shortfall. More-

over, witnesses who participated in negotiating and drafting the agreements testified that Great Country did not expect a full recovery on Nicotra's debts.

In addition, although the satisfaction agreement contained numerous schedules describing Nicotra's financial status and his outstanding debt, the agreement did not indicate that any equity remained in the transferred properties. Furthermore, neither of the witnesses who testified as to the valuation procedures used when negotiating the agreements provided specific information regarding his analysis. Lenahan testified that he was responsible for obtaining up-to-date appraisals on the properties, but he offered no detailed evidence regarding his findings. Hirtle testified that a cash flow analysis had been conducted, which he believed, in view of the deteriorating real estate market and the number of failing banks in Connecticut, was a "more solid" approach to determining value, but he likewise provided no specific information regarding his findings.

Finally, there was no evidence that the effect of the satisfaction and intercreditor agreements was to extinguish the Delco debt. There was no evidence that Great Country received remuneration from Nicotra at the time the agreements were signed or at any time thereafter in partial payment of the debt. Each and every witness, including the defendant, also testified that he had no knowledge of what happened to the transferred assets after the agreements were signed. Accordingly, the record contains no evidence that the creditors received proceeds from any of the liquidated assets or that any transferred assets were even liquidated. In fact, Lenahan specifically testified that as of one year later, the bank had received no proceeds from the creditors' pool pursuant to the agreements.

The defendant nonetheless claims that sufficient evidence existed for the jury to make a reasonable and

legal finding in his favor on the first special defense. The defendant relies on Nicotra's testimony that he believed that there was adequate value in the transferred assets to fully settle his debts, Hirtle's testimony that a potential buyer made an offer of $18 million on the Caribbean property and Hirtle's testimony that Nicotra's classic car collection, which was assigned to the creditor's pool, was valued at $400,000. None of that testimony, however, even when considered in the light most favorable to the defendant, provides a sufficient evidentiary basis to support the defendant's claim.

As previously stated, Nicotra's testimony was not supported by the facts. When queried as to how he could maintain a belief that his properties had sufficient value to settle his debts in the face of clear evidence that his liabilities exceeded his assets by more than $22 million, Nicotra responded that he perceived the properties as being "good from an earnings standpoint," despite the weak real estate market at the time. In contrast, Nicotra's attorney testified that on the basis of a cash flow analysis that considered the net operating income generated by the properties, he had concluded that Nicotra's assets were insufficient to cover his liabilities.[10]

Hirtle's testimony on the Caribbean property also fails to provide a sufficient evidentiary basis for a finding in the defendant's favor. Hirtle testified that the first mortgage on the property was approximately $4 million to $4.5 million, and that the sale of the property might have yielded $14 million in proceeds for the creditors' pool. In fact, the satisfaction agreement indicates that the first mortgage held by the Bank of Nova Scotia was approximately $2 million, the amount of total debt on the property was more than $8 million and Nicotra's

---

[10] The cash flow analysis was the only potential evidence on the issue of earnings, but it was not entered into evidence by either party.

own estimate of the property's value was $12.4 million, not $18 million. Nonetheless, even if Hirtle's testimony had been correct, and if the sale had occurred and the proceeds had been realized as predicted, Great Country's 12.81 percent share of those proceeds, or $1,792,000, would have been insufficient to satisfy the outstanding balance on the Delco debt at the time the agreements were signed. Furthermore, for the jurors to have relied on Hirtle's testimony would have required them to ignore compelling evidence that the offer never ripened into an agreement, in part because the Bank of Nova Scotia would not consent to the buyer's demand that he be permitted to assume the mortgage, an event completely out of Nicotra's or the creditors' control. In addition, had any other buyer offered $18 million for the Caribbean property, a sale would have yielded only $9,448,000 in net proceeds, not $14 million, after satisfying the property's total existing debt obligation of $8,552,000. Great Country's 12.81 percent share of that amount would have been $1,210,288, far short of what was needed to satisfy the Delco debt.

As for the classic car collection, although Hirtle testified that the collection was worth $400,000, schedule 201 (a) of the satisfaction agreement lists the value of the collection at only $228,000. Assuming, however, that the cars were sold and net proceeds of $400,000 were realized, Great Country's 12.81 percent share would have amounted to only $52,000. Assuming further, that the $52,000 had been applied exclusively to the Delco debt, and not to Nicotra's other unsecured obligations to Great Country of approximately $700,000, the combined proceeds realized by Great Country from the sale of the cars and the Caribbean property would not have been sufficient to satisfy the debt. As a result, even under the most favorable interpretation of the limited evidence on which the defendant relies, there was no

basis for a finding that Nicotra's agreement with Great Country settled the entire Delco debt.

Finally, any potential conclusion by the jury that the sale of the Connecticut properties might have yielded significant proceeds would have been highly speculative and, therefore, unwarranted. Testimony indicated that property values in the state were falling rapidly and that Connecticut banks were failing at the time the agreement was signed. Moreover, there was no evidence as to how much, if any, equity remained in those properties. Indeed, evidence that Nicotra's liabilities exceeded his assets by more than $22 million suggests that no equity remained, which is why the banks determined that a settlement agreement would constitute the best possible solution to Nicotra's financial difficulties.

Accordingly, there was no evidentiary basis for a finding that the satisfaction agreement represented an accord and satisfaction of the Great Country debt, and we conclude that the court improperly denied the plaintiff's motion for a directed verdict on the first special defense.

## B

The defendant alleged in his second special defense, breach of the implied covenant of good faith and fair dealing, that Great Country improperly induced him to sign the $100,000 promissory note after failing to disclose that it had settled the Delco debt with Nicotra for good and valuable consideration.[11] We conclude that

---

[11] The defense is designated as the fourth special defense in the defendant's pleadings. The defendant alleged: "Prior to the entering into the Note relationship between the parties to this action, defendant and co-obligors ROBERT GINSBURG and DENNIS NICOTRA were indebted to GREAT COUNTRY BANK in the amount of $2,000,000.00. GREAT COUNTRY BANK, without disclosing to defendant and ROBERT GINSBURG settled said debt obligation for good and valuable consideration. GREAT COUNTRY BANK thereafter induced defendant and ROBERT GINSBURG to enter into a settlement as memorialized by the execution of NOTES. The plaintiff knew or should have known of said prior facts during the course of review and due [diligent] investigation of the loan file prior to purchasing same. The plaintiff

there was no evidentiary basis on which to support a jury finding in favor of the defendant.

"The common-law duty of good faith and fair dealing implicit in every contract requires that neither party [will] do anything that will injure the right of the other to receive the benefits of the agreement. . . . Essentially it is a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended." (Internal quotation marks omitted.) *Elm Street Builders, Inc.* v. *Enterprise Park Condominium Assn., Inc.*, 63 Conn. App. 657, 665, 778 A.2d 237 (2001). "Bad faith means more than mere negligence; it involves a dishonest purpose." *Habetz* v. *Condon*, 224 Conn. 231, 237, 618 A.2d 501 (1992). "Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." (Internal quotation marks omitted.) Id.

We conclude that the evidence was insufficient to support a finding in the defendant's favor on the second special defense. The defense was premised on the assumption that Great Country had settled the entire Delco debt with Nicotra. As discussed in part I A of this opinion, however, there was no factual basis to support such a finding. Consequently, the defendant's claim that Great Country improperly induced him to sign the $100,000 promissory note after failing to disclose that Nicotra had settled the entire debt is completely lacking in substance. Accordingly, we conclude that the court improperly denied the plaintiff's motion for a directed verdict on the second special defense.

assumes all liabilities of the prior holder in due course of said debt instrument GREAT COUNTRY BANK. GREAT COUNTRY BANK failed to engage in good faith and fair dealing with defendant during the creation of the debt relationship between the parties . . . ."

## C

The defendant alleged in his third special defense, fraudulent misrepresentation, that Great Country fraudulently obtained the $100,000 note from the defendant after receiving payment in full from the Nicotra settlement.[12] We conclude that there is no evidentiary basis on which to make a finding for the defendant on that defense.

"The essential elements of a cause of action in [fraudulent misrepresentation] are: (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury." (Internal quotation marks omitted.) *Jaser* v. *Fischer*, 65 Conn. App. 349, 358, 783 A.2d 28 (2001).

The underlying premise of the third special defense was that Great Country had settled the entire Delco debt when it entered into the satisfaction agreement with Nicotra. As stated in part I A, however, there was no factual basis on which the jury could have made

---

[12] The defense is designated as the second special defense in the defendant's pleadings, and alleged: "Prior to the entering into the Note relationship between the parties to this action, defendant and co-obligors ROBERT GINSBURG and DENNIS NICOTRA were indebted to GREAT COUNTRY BANK in the amount of $2,000,000.00. GREAT COUNTRY BANK, without disclosing to defendant and ROBERT GINSBURG settled said debt obligation for good and valuable consideration. GREAT COUNTRY BANK thereafter induced defendant and ROBERT GINSBURG to enter in a settlement as memorialized by the execution of NOTES. The plaintiff knew or should have known of said prior facts during the course of review and due [diligent] investigation of the loan file prior to purchasing same. The plaintiff assumes all liabilities of the prior holder in due course of said debt instrument GREAT COUNTRY BANK. At the time the parties entered into the Note, GREAT COUNTRY BANK Intentionally and willfully omitted material facts as are more particularly described above in order to induce the defendant to enter into said Note. If GREAT COUNTRY BANK had disclosed the settlement made with DENNIS NICOTRA, the defendant would not have and did not need to enter into said Note . . . ."

such a finding. We therefore conclude that the court improperly denied the plaintiff's motion for a directed verdict on the third special defense and remand the case to the trial court for a hearing in damages.

## II

The defendant claims that the court improperly denied his motion to disqualify the plaintiff's counsel pursuant to rule 1.9 of the Rules of Professional Conduct.[13] He therefore requests that in the event of a new trial, that the plaintiff's counsel be disqualified because he previously represented the defendant in another matter and had access to confidential information relating to the defendant's finances. The defendant claims that this information had a material and adverse effect on his present case because it affected the ability of the plaintiff to know whether to file for a prejudgment remedy and allowed the plaintiff to plan a collection strategy in the event of success at trial. We consider the claim in the context of the remand for a hearing in damages and conclude that it has no merit.

In 1996, the plaintiff's counsel represented the defendant's law firm in a malpractice action and had access to information regarding the law firm's finances. That case settled in 1997. In 1999, counsel for the defendant in the malpractice action became the plaintiff's counsel in the present case. Prior to jury selection, the defendant filed a motion seeking to disqualify the plaintiff's coun-

---

[13] Rule 1.9 of the Rules of Professional Conduct provides: "Conflict of Interest: Former Client

"A lawyer who has formerly represented a client in a matter shall not thereafter:

"(1) Represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation; or

"(2) Use information relating to the representation to the disadvantage of the former client except as Rule 1.6 would permit with respect to a client or when the information has become generally known."

sel because financial information previously had been divulged to counsel regarding the defendant's law firm.

The defendant and his law firm partner testified that at the time of the malpractice action, they participated in a general discussion with the plaintiff's counsel of the law firm's financial structure and ownership interests, but they could not recall if there had been any specific discussion of the firm's financial records. They also could not recall whether the information discussed was such that specific inferences could be made about the firm's income, receipts and expenses.

The court denied the motion on the ground that there was insufficient evidence that the malpractice case and the present case were substantially related and that disclosures in the prior case as to the defendant's personal financial circumstances were likely to be used to the defendant's disadvantage in the present action. The court noted that the defendant and his partner were unable to state what information was transmitted that reasonably could be considered confidential. The court also observed that the defendant had not established that rule 1.9 applied in the present circumstances.

"The Superior Court has inherent and statutory authority to regulate the conduct of attorneys who are officers of the court. . . . We accord wide discretion to a trial court's ruling on a motion for disqualification of counsel for conflict of interest. . . . In determining whether the trial court abused its discretion, we indulge every reasonable presumption in favor of the correctness of the court's decision." (Internal quotation marks omitted.) *American Heritage Agency, Inc.* v. *Gelinas*, 62 Conn. App. 711, 724–25, 774 A.2d 220, cert. denied, 257 Conn. 903, 777 A.2d 192 (2001).

We conclude that court did not abuse its discretion in denying the defendant's motion absent specific evidence as to the financial information disclosed in the

malpractice case and its likely effect on the present trial. We also conclude that there is no basis for disqualifying the plaintiff's counsel on remand for the very limited purpose of a hearing in damages.

The judgment is reversed and the case is remanded with direction to grant the plaintiff's motion for a directed verdict and thereafter to conduct a hearing in damages.

In this opinion the other judges concurred.