[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE APPLICATION FOR TEMPORARY INJUNCTION
An amended verified complaint was filed by the plaintiff, Jacob Zamstein, M.D., on September 13, 2001, against the defendant, Anthem Blue Cross Blue Shield of Connecticut, Inc. (Anthem), alleging breach of contract (count one), breach of the implied covenant of good faith and fair dealing (count two), tortious interference with business expectancies (count three) and violation of the Connecticut Unfair Trade Practices Act (CUTPA) (count four). The plaintiff seeks a temporary and permanent injunction prohibiting Anthem from terminating him as well as compensatory and punitive damages, attorneys fees and costs.
Presently before the court is the application of the plaintiff for a temporary injunction prohibiting Anthem from (1) terminating the plaintiff's participation in the Anthem provider network, (2) terminating its participation agreement with the plaintiff and/or (3) ordering the plaintiff to remove all signs and written information in the plaintiff's office that identifies him as a member of the Anthem programs. The plaintiff's ex parte application for a temporary restraining order prohibiting Anthem from taking the above enumerated actions was granted by the court, Beach, J., on July 21, 2001, and remains in effect to the present date. This court held hearings on the plaintiff's application for a temporary injunction on March 8, 2002, March 12, 2002, April 25, 2002, and April 29, 2002. In addition, the parties have each filed post-hearing memoranda. From the testimony and evidence submitted at the hearings, the court finds the following facts.
 I
The plaintiff is a licensed medical doctor specializing in urology with a principal place of business in Bloomfield, Connecticut. Since 1994, the plaintiff has had an ongoing contractual relationship with Anthem pursuant to a Participating Physician Agreement (provider agreement) whereby the CT Page 11289-b plaintiff provides medical services to various Anthem members in exchange for payment by Anthem.
The court heard testimony from George Dolan, an agent with the Federal Bureau of Investigation (FBI) in Connecticut, who testified that the federal government began investigating alleged Medicare/Medicaid fraud in connection with the sale and distribution of a cancer-treating drug in the summer of 1999.[1] As relevant to the present case, similar investigations were being conducted in Massachusetts and Connecticut. Dolan first asked the plaintiff to assist the FBI as a cooperating witness in connection with the Connecticut investigation in late July or early August 1999. One of the guidelines issued by the federal government for cooperating in a federal investigation is not to disclose such cooperation to anyone outside of the FBI or United States Attorney's Office. In 1999, the plaintiff was in fact directed not to disclose his cooperation with federal authorities in the Connecticut investigation. At that time, Dolan was aware that the plaintiff was himself a target of the Massachusetts investigation for alleged illegal billing practices involving the aforementioned cancer drug. Thus, to the extent that doing so might compromise the plaintiff's ability to gather evidence for use in the Connecticut investigation, the plaintiff was further directed not to disclose that he was a target of the Massachusetts investigation to certain individuals.
On November 3, 2000, as a result of the Massachusetts investigation, the United States Attorney for the District of Massachusetts filed a criminal information charging the plaintiff with the felony crime of conspiring to defraud the United States in violation of18 U.S.C. § 371.[2] The plaintiff pleaded guilty in United States District Court for the District of Massachusetts to this charge on December 27, 2000, and, at the time of the hearings before this court, was still awaiting sentencing.[3] The federal criminal file was not sealed, and several prominent newspapers carried articles regarding the plaintiff before and after his guilty plea. In fact, the United States Attorney's Office issued a press release announcing the charge against the plaintiff on the date the criminal information was filed.[4] In short, the charge against the plaintiff and his resulting guilty plea were matters of public record.
The plaintiff did not notify Anthem of the Massachusetts investigation, of the felony charge against him or of his guilty plea. Anthem first learned of these events in February 2001, when, in the course of verifying the plaintiff's December 2000 recredentialing application,[5] Anthem was informed by the department of public health (DPH) that an investigation was pending in regard to his licensure. CT Page 11289-c Anthem then generated a letter dated February 19, 2001 to the plaintiff requesting details of the investigation within ten days. Counsel for the plaintiff responded to Anthem's request by letter dated February 22, 2001, explaining that because the investigation by the federal government was ongoing and active, the plaintiff was constrained to provide a detailed explanation at that time. Counsel referred Anthem to the Assistant United States Attorney, Michael K. Loucks, Health Care Fraud Chief, to whom any questions should be directed. Further, the plaintiff's counsel attached a letter from Lewis Morris, a representative from the Office of Inspector General, Department of Health Human Services, and a letter from Loucks, representing that "Dr. Zamstein will not be excluded from Medicare or Medicaid and that no conduct by Dr. Zamstein affected the care provided to any of his patients."[6]
By letter dated May 22, 2001, Anthem notified the plaintiff that his participation as a provider of specified Anthem programs and products was being terminated effective June 1, 2001. No reason for the termination was given. Anthem, however, by letter dated June 1, 2001, corrected the original June 1, 2001 termination date, extending it to August 1, 2001, thereby providing sixty days notice of termination,[7] and further provided as a reason for the termination the plaintiff's failure to comply with a notification provision of the provider agreement. The provision referenced, as contained in the 1999 provider agreement in evidence, states in Section II.E. that "[t]he Group [i.e., Jacob Zamstein, M.D., LLC] shall notify Anthem BCBS in writing within seven (7) days after the occurrence of . . . (vii) Any criminal action against the Group or a Represented Provider . . ." The letter states that Anthem did not receive notice of the criminal action against the plaintiff until February 26, 2001, when it received the Loucks letter attached to the plaintiff's counsel's letter dated February 22, 2001, referencing the criminal charges filed against the plaintiff. Anthem in its letter further informed the plaintiff of his right to appeal the termination.
Thereafter, the plaintiff exercised his right to appeal the termination to an Anthem hearing panel. At the appeal hearing the plaintiff presented evidence that federal government officials had ordered him to refrain from disclosing information concerning his interactions with the federal government regarding the ongoing investigation. Nevertheless, Anthem upheld its decision terminating the plaintiff as a provider.
 II
"There is a four-part test for the issuance of a temporary injunction: (1) the plaintiff ha[s] no adequate legal remedy; (2) the plaintiff would suffer irreparable injury absent [the injunction]; (3) the plaintiff [is] CT Page 11289-d likely to prevail . . . and (4) the balance of the equities favor[s] the issuance of the injunction] . . . Boutilier v. The Saybrook Manor, Superior Court, judicial district of Middlesex at Middletown, Docket No. 94366 (July 26, 2001, Arena J.), citing Waterbury Teachers Assn. v.Freedom of Information Commission, 230 Conn. 441, 446, 645 A.2d 978
(1994). In exercising its discretion, the court, in a proper case, may consider and balance the injury complained of with that which will result from interference by injunction . . . Moore v. Ganim, 233 Conn. 557, 569
n. 25, 660 A.2d 742 (1995). The issuance of an injunction is the exercise of an extraordinary power which rests within the sound discretion of the court, and the justiciable interest which entitles one to seek redress in an action for injunctive relief is at least one founded on the imminence of substantial and irreparable harm. Silitschanu v. Groesbeck,12 Conn. App. 57, 64, 529 A.2d 732 (1987), aff'd., 208 Conn. 312,543 A.2d 737 (1988). This criterion necessarily requires consideration of the probable outcome of the litigation. Griffin Hospital v. Commission onHospitals Health Care, 196 Conn. 451, 457, 493 A.2d 229 (1985)." (Internal quotation marks omitted.) Rocque v. Connecticut Waste Oil,Inc., Superior Court, judicial district of Hartford, Docket No. CV 01 809202 (December 20, 2001, Bryant, J.) (31 Conn.L.Rptr. 148, 148-49).
In analyzing the four-part test for issuance of a temporary injunction under the facts of the present case, this court finds that the plaintiff cannot meet at least one of the four prongs, that is, the plaintiff has not established that he is likely to prevail on the merits.[8] For this reason, the plaintiff's application for a temporary injunction must be denied. Although the plaintiff has limited his motion to count one (breach of contract) and count two (breach of the covenant of good faith and fair dealing), the likelihood of success on the merits as to all four counts is addressed herein.[9]
 A
As to count one of the amended verified complaint, alleging breach of contract, the plaintiff has not established that he is likely to prevail. It is undisputed that the claimed basis for the plaintiff's termination is his failure to notify Anthem within seven days of any criminal action against him as required by the provider agreement. It is the plaintiff's position that the provider agreement is ambiguous since it does not define what constitutes "criminal action," and thus there is no benchmark by which to start the running of the seven-day time period. The plaintiff argues that the ambiguity should accordingly be resolved in his favor and urges a construction that "criminal action," and therefore the notification period, does not arise until sentencing, which the plaintiff is still awaiting. The plaintiff further argues that his CT Page 11289-e termination violates public policy in light of the fact that federal authorities prohibited him from disclosing any information regarding the investigations.
These arguments are without merit. The interpretation of "criminal action" advocated by the plaintiff is unduly narrow and would severely undermine a primary purpose of the notification provision. The plaintiff's interpretation would mean that only a criminal action brought against a provider which results in a conviction and sentencing would have to be disclosed, with disclosure required only after the sentencing stage. Along the same vein, only a civil action, for example, for malpractice, which resulted in a judgment against the provider would have to be disclosed, and only after judgment has been rendered. The possibility exists that, in the individual case, sentencing or judgment could take years to reach. A primary purpose behind the notification provision, however, is to aid Anthem in protecting the health and safety of its members from physicians who are charged with malpractice or criminal activity and who therefore pose a possible risk to member health and safety. Prompt notification enables a prompt investigation by Anthem to determine whether immediate termination is warranted. This is reflected in the termination provisions themselves, providing for prompt termination in specified cases where member health and safety may be implicated. See footnote 7. Even if this court were to hold that "criminal action" as used in the provider agreement is ambiguous, the interpretation of "criminal action" advocated by the plaintiff is unreasonable based on the undisputed evidence presented at the hearing and this court therefore declines to accept it. Whatever event ultimately is held to have triggered the seven-day notification period, whether it be the filing of the information against the plaintiff on November 3, 2000, his arrest or the entering of and acceptance of his guilty plea on December 27, 2000, it is clear that each of them unambiguously constitutes criminal action and that the plaintiff failed to notify Anthem of any of these events within seven days of their occurrence, in violation of his obligation to do so under the provider agreement.
The court also rejects the plaintiff's argument that he was prohibited by government directives from complying with the notification provision. While there is evidence that the federal authorities in Connecticut directed him not to discuss his cooperation with anyone, there is no evidence that the federal authorities in Massachusetts directed him not to disclose his very public criminal prosecution in the District of Massachusetts. It is illogical that the federal government would instruct the plaintiff not to disclose his arrest and/or the investigation and charges brought against him and at the same time issue a press release about this event.[10] Once the criminal charge against him was made CT Page 11289-f public by way of a press release on November 3, 2000, and he pleaded guilty in open court on December 27, 2000, the plaintiff could not reasonably claim that he was obligated to federal authorities not to disclose that he was subject to a Medicare or Medicaid investigation. Moreover, even if the government had instructed the plaintiff not to notify Anthem of the criminal action instituted and pending against him, the plaintiff's choice to cooperate with the government and comply with its nondisclosure instructions — and therefore to breach his contract with Anthem — was voluntary. While the court is sympathetic to the difficulty in choosing between a reduced sentence and remaining a participant in the Anthem provider network, such difficulty in no way excuses the plaintiff's voluntary breach of his private contractual obligations.[11] The plaintiff therefore accepted the risk that Anthem would terminate him for such breach when he chose to cooperate with federal authorities. In addition, in accordance with the provision of both the 1994 and 1999 provider agreements, either party could terminate the agreement with or without cause upon sixty (60) days prior written notice. It is undisputed that Anthem's June 1, 2001 letter provided the plaintiff with sixty days' written notice of termination.
 B
The plaintiff has not established the likelihood of prevailing as to count two of the amended verified complaint, alleging breach of the covenant of good faith and fair dealing. The gravamen of the plaintiff's argument with regard to this claim is that Anthem breached the covenant of good faith and fair dealing by (1) terminating him despite his explanation that he could not comply with the notification provision because of government directives and (2) failing to provide a true appeal process.[12]
"`The common-law duty of good faith and fair dealing implicit in every contract requires that neither party [will] do anything that will injure the right of the other to receive the benefits of the agreement . . . Essentially it is a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended' . . . Elm Street Builders, Inc. v. Enterprise Park CondominiumAssn., Inc., 63 Conn. App. 657, 665, 778 A.2d 237 (2001). `Bad faith means more than mere negligence; it involves a dishonest purpose.' Habetzv. Condon, 224 Conn. 231, 237, 618 A.2d 501 (1992). `Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive' . . . Id."Cadle Co. v. Ginsberg, 70 Conn. App. 748, 768 (2002). CT Page 11289-g
In the present case, there was no evidence whatsoever presented showing or suggesting bad faith on the part of Anthem. The plaintiff has therefore failed to establish that he is likely to prevail as to count two.
 C
Count three of the amended verified complaint alleges that Anthem tortiously interfered with the plaintiff's business expectancies. "It is well established that the elements of a claim for tortious interference with business expectancies are: (1) a business relationship between the plaintiff and another party; (2) the defendant's intentional interference with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffers actual loss."Hi-Ho Tower, Inc. v. Com-Tronics, Inc., 255 Conn. 20, 27, 761 A.2d 1268
(2000). "An action for tortious interference with a business expectancy is well established in Connecticut. The plaintiff need not prove that the defendant caused the breach of an actual contract; proof of interference with even an unenforceable promise is enough . . . A cause of action for tortious interference with a business expectancy requires proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously . . . It is also true, however, that not every act that disturbs a contract or business expectancy is actionable . . . A defendant is guilty of tortious interference if he has engaged in improper conduct . . . [T]he plaintiff [is required] to plead and prove at least some improper motive or improper means." (Citations omitted; internal quotation marks omitted.)Biro v. Hirsch, 62 Conn. App. 11, 21, 771 A.2d 129, cert. denied,256 Conn. 908, 772 A.2d 601 (2001). "Stated simply, to substantiate a claim of tortious interference with a business expectancy, there must be evidence that the interference resulted from the defendant's commission of a tort." (Internal quotation marks omitted.) Id.
As discussed in the previous section, no evidence whatsoever was produced tending to show or suggest that Anthem acted fraudulently, maliciously, with an improper motive or with improper conduct. The plaintiff therefore has failed to establish that he is likely to prevail as to count three.
 D
Finally, the court finds that the plaintiff has failed to establish a likelihood of prevailing on the fourth count of the amended verified complaint alleging a violation of CUTPA. "It is well settled that in CT Page 11289-h determining whether a practice violates CUTPA we have adopted the criteria set out in the `cigarette rule' by the federal trade commission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [competitors or other businesspersons] . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." (Internal quotation marks omitted.) HartfordElectric Supply Co. v. Allen-Bradley Co., 250 Conn. 334, 367-68,736 A.2d 824 (1999). Thus, "[a] violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy . . . Furthermore, a party need not prove an intent to deceive to prevail under CUTPA." (Internal quotation marks omitted.) Willow Springs Condominium Assn., Inc. v. Seventh BRTDevelopment Corp., 245 Conn. 1, 43, 717 A.2d 77 (1998).
Anthem's actions in terminating the plaintiff as a result of his failure to notify it of the criminal action against him within seven days does not run afoul of any established public policy. This is so particularly in light of this court's determination above that the plaintiff's failure to comply with the notification provision of the provider agreement by disclosing the criminal action brought against him was not excused or justified by the federal government's directives not to disclose his involvement in the investigation.
Moreover, this court agrees with the vast majority of Superior Court decisions concluding that, "absent allegations [and proof] of sufficient aggravating circumstances, [a] simple breach of contract, even if intentional, does not amount to a violation of CUTPA . . ." (Internal quotation marks omitted.) Princeton Capital Finance Co., LLC v. WebsterBank, Superior Court, judicial district of Hartford, Docket No. CV 99 590676 (February 4, 2002, Peck, J.) (31 Conn.L.Rptr. 360, 362-63); see also Derrig v. Thomas Regional Directory Co., Superior Court, judicial district of Hartford, Docket No. CV 98 583548 (June 22, 1999, Peck, J.). Thus, even if Anthem did breach the contract, and even if such breach was intentional, the plaintiff has simply failed to present any evidence whatsoever that the actions of Anthem were undertaken in bad faith, amounted to a deceptive or fraudulent practice or were immoral, unethical, oppressive, unscrupulous or in violation of public policy. For this reason, the plaintiff has failed to establish that he is likely to CT Page 11289-i prevail on the CUTPA claim.
 CONCLUSION
Based on the foregoing, the court finds that the plaintiff has failed to satisfy at least one prong of the four-part test for issuing a temporary injunction, namely, that he is likely to prevail on the merits. Accordingly, the plaintiff's application for a temporary injunction is denied. This memorandum of decision is hereby ordered sealed for a period of twenty (20) days from the date of its filing, after which time, absent further order of this court, it may be unsealed along with all other previously sealed documents in the court file.
Peck, J.