## JULIANA KLEIN ET AL. *v.* BRISTOL HOSPITAL ET AL.

## WALTER CWIKLA *v.* G. PETER BLOOM ET AL.

Superior Court, Complex Litigation Docket at Hartford
File Nos. X09-CV-04-0833536S, X09-CV-04-0830894S

Memorandum filed October 12, 2006

*Stratton Faxon*, for the named plaintiff et al. in the first case and the plaintiff in the second case.

*Cowdery, Ecker & Murphy, LLC*, for the plaintiff Stratton Faxon in the first case.

*O'Brien, Tanski & Young, LLP*, for the named defendant in the first case.

*Danaher, Lagnese & Neal, PC*, and *Murtha Cullina, LLP*, for the defendant Suzanne Miller et al. in the first case.

*Carmody & Torrance*, for the named defendant et al. in the second case.

*Cooney, Scully & Dowling*, for the defendant Hartford Hospital in the second case.

SHORTALL, J. In these two medical malpractice cases, motions to disqualify the law firm representing the plaintiffs have been filed. An evidentiary hearing that consumed the equivalent of two and one-half days revealed that there are no genuine disputes among the parties as to the material facts, just different emphases and interpretations of those facts as they relate to the established law on disqualification of attorneys from representations adverse to their former clients. The court has concluded that the motions to disqualify should be denied.

I

Attorney Paul Edwards practiced law with the firm of Danaher, Lagnese and Neal (Danaher firm) for thirteen years, from 1993 to May, 2006, when he left to become a partner in the firm of Stratton Faxon (Stratton firm). The Danaher firm specializes in the defense of medical malpractice cases, the Stratton firm in their prosecution. Edwards' practice while with the Danaher firm was almost exclusively the defense of such cases. It appears from the evidence that his practice with the Stratton firm will be heavily if not exclusively in representing plaintiffs in the same kind of cases.[1]

The first matter, *Klein* v. *Bristol Hospital*, (Docket No. X09-CV-04-0833536S), is one in which the Danaher firm, but not Edwards, has represented codefendants Suzanne Miller, a physician, and Central Connecticut Obstetrics and Gynecology (Central), since its inception. The Stratton firm has represented the named plaintiff, Juliana Klein, and coplaintiff, Barbara Klein, during that same period and continues to do so. Edwards is not and will not be involved in the prosecution of that lawsuit, but a motion to disqualify the Stratton firm has been filed on behalf of Physicians for Women's Health (Physicians), a Connecticut limited liability company

---

[1] When Edwards moved to the Stratton firm, the firm placed a notice in the Connecticut Law Tribune that he "had left the dark side" and joined the firm as a partner. The court can understand the disappointment of Edwards' former partners and clients at this characterization. He had learned his craft at the Danaher firm, after all, while defending physicians and others charged with professional negligence. The court heard about this notice early and often but found it to have little probative value on the issues before it. Fortunately for the court, the parties agreed that it is not necessary for it to decide which side is the dark and which the light. An exhibit to the Stratton firm's opposition to the motions for disqualification, an e-mail to Faxon from a noted malpractice defense attorney, comments on Edwards' shift to "the dark side." The notice is evidence only of the Stratton firm's misplaced sense of humor in announcing Edwards' advent to their firm.

of which Central is a constituent unit, based on Edwards' prior representation of other doctors who are members of Physicians.

The second matter, *Cwikla* v. *Bloom*, (Docket No. X09-CV-04-0830894S), has never been defended by the Danaher firm; rather, the named defendant, G. Peter Bloom, a physician, and codefendant Connecticut Surgical Group (Surgical), of which Bloom is a member, have been and are represented by attorney Augustus R. Southworth III of Carmody and Torrance (Carmody firm), who specializes in the defense of such cases. The Stratton firm has represented the plaintiff since the inception of the case, and Edwards has now been assigned to handle that matter. While at the Danaher firm, he represented four physicians who were and are members of Central. In three of those cases Central was a defendant as well, its alleged liability based on the claimed negligence of its member physicians; so, Edwards represented Central as well as the individual physicians in those cases. For that reason, the defendants in *Cwikla* have moved to disqualify not only Edwards but also the Stratton firm.

Additional relevant facts will be set forth as necessary in a more detailed discussion of each of these cases.

II

Because the defendants seek to disqualify the Stratton firm, the principal ethical provision implicated is rule 1.10 (b) of the Rules of Professional Conduct, which provides: "When a lawyer becomes associated with a firm, the firm may not knowingly represent a person in the same or a substantially related matter in which that lawyer, or a firm with which the lawyer was associated, had previously represented a client whose interests are materially adverse to that person and about

whom the lawyer had acquired information protected by Rules 1.6 and 1.9 (2) that is material to the matter."[2]

It is clear from rule 1.10 (b) that not all representation adverse to a migrating lawyer's former clients is forbidden to his new firm. Rather, the lawyer's new firm may not represent a client *in the same or a substantially related matter* in which its new lawyer, or a firm with which he was previously associated, had represented a person whose interests are materially adverse to the new firm's client, *and* in which the new lawyer *had acquired confidential information* about his former client which is material to the new matter.

The Connecticut Supreme Court has succinctly stated the rationale for requiring disqualification in certain cases involving a lawyer's former clients and established a balancing test for the court to apply in considering such a motion: "Disqualification of counsel is a remedy that serves to enforce the lawyer's duty of absolute fidelity and to guard against the danger of inadvertent use of confidential information. . . . In disqualification matters, however, we must be solicitous of a client's right freely to choose his counsel . . . mindful of the fact that a client whose attorney is disqualified may suffer the loss of time and money in finding new counsel and may lose the benefit of its longtime counsel's specialized knowledge of its operations. . . . The competing interests at stake in the motion to disqualify, therefore, are: (1) the defendant's interest in protecting confidential information; (2) the

---

[2] Rule 1.6 of the Rules of Professional Conduct prohibits an attorney from revealing "information relating to representation of a client unless the client consents after consultation . . . ." Rule 1.9 (2) of the Rules of Professional Conduct provides in pertinent part: "A lawyer who has formerly represented a client in a matter shall not thereafter . . . [u]se information relating to the representation to the disadvantage of the former client except as Rule 1.6 would permit with respect to a client or when the information has become generally known."

plaintiffs' interest in freely selecting counsel of their choice; and (3) the public's interest in the scrupulous administration of justice." (Citations omitted; internal quotation marks omitted.) *Bergeron* v. *Mackler*, 225 Conn. 391, 397–98, 623 A.2d 489 (1993).

In so doing the court has allied itself with the majority view of the core interest at stake in rules 1.9 and 1.10, the protection of confidential information gained from a former client by the attorney and at risk of disclosure in his subsequent adverse representation. See 1 G. Hazard & W. Hodes, The Law of Lawyering (3d Ed. 2001 & 2005-1 Sup.) § 13.5, p. 13-13.[3]

Sometimes the risk of disclosure of confidential information is clear, as when the new firm seeks to represent a client with interests adverse to its new lawyer's former client in the same legal dispute. Also, when "the relationship between the issues in the prior and present cases is patently clear or when the issues are identical or essentially the same"; (internal quotation marks omitted); *Bergeron* v. *Mackler*, supra, 225 Conn. 399; the cases will be found to be "substantially related," and "the receipt of confidential information that would potentially disadvantage a former client is presumed." Id.[4]

Even where the matters are not "substantially related" in this sense, i.e., where the issues are not "identical or essentially the same," matters may be

[3] "Today, most courts and other authorities hold that the substantial relationship test is not a formalistic inquiry into degrees of closeness, but is in large measure a judgment as to whether the former client's confidences are at risk of being turned against him." 1 G. Hazard & W. Hodes, supra, § 13.5, p. 13-13.

[4] Such a case was *Fallacaro* v. *Fallacaro*, Superior Court, judicial district of Hartford, Docket No. FA-98-0719606S (April 8, 1999) (24 Conn. L. Rptr. 355) (*Bishop, J.*), where the court disqualified the law firm which represented the plaintiff husband in prior dissolution proceedings where his financial condition was at issue from representing his present wife in their dissolution, where the husband's financial condition was again at issue.

found to be "substantially related" if there is a "substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter." Model Rules of Professional Conduct 1.9, comment (3), 68 Conn. L.J., No. 4, p. 38B (July 25, 2006), effective January 1, 2007.

There are, thus, three questions to ask: What was the actual scope of the migrating lawyer's prior representation? What confidential information would he "normally" have obtained in the course of that representation? Will the confidential information presumed to have been acquired give the new firm and its client an advantage over the prior client?

It has been held that the party seeking disqualification bears the "burden of proving facts which indicate disqualification is necessary." (Internal quotation marks omitted.) *Cyr Real Estate* v. *Cuzio*, Superior Court, judicial district of New Haven, Docket No. CV-05-4006819S (March 29, 2006) (*Silbert, J.*). This court agrees that the burden of proving the basic facts of the prior representation, its actual scope, i.e., what legal work was done, for whom, on what timetable, and the like, rests on the party seeking disqualification.[5] In doing so, the moving party need not introduce evidence as to the particular confidences he claims to have imparted to the attorney because that would result in the "revelation of the very information the [rule] is designed to protect." *Goldenberg* v. *Corporate Air, Inc.*, 189 Conn. 504, 512, 457 A.2d 296 (1983).

Once the migrating attorney's opportunity to acquire confidential information of the former client is shown,

---

[5] The court is also mindful of the caution found in the commentary to rule 1.7 of the Rules of Professional Conduct that a motion to disqualify filed by opposing counsel "should be viewed with caution . . . for it can be misused as a technique of harassment."

however, the commentary to rule 1.10 of the Rules of Professional Conduct explicitly places the burden of proving the facts of his access to information while he represented earlier clients "upon the firm whose disqualification is sought." This burden may be met through the testimony of the attorney as to the depth of his involvement in the prior representation and his actual knowledge of the client's affairs.[6]

Finally, the firm whose disqualification is sought may prove that a screening mechanism has been put in place to prevent the spread throughout the firm of any information the new attorney may have acquired. Although the Model Rules of Professional Conduct adopted by the American Bar Association do not permit firms to avoid disqualification by erecting screens or isolation walls, at least where the new attorney has actual knowledge of prior client confidences, state and federal courts have "denied motions to disqualify law firms that would have been granted, were it not for the timely erection of ethics screens." 1 G. Hazard & W. Hodes, supra, § 14.9, p. 14-27. That trend has been exemplified in several Connecticut cases. See *Beckenstein Enterprises* v. *Smith*, Superior Court, judicial district of Tolland, Complex Litigation Docket, Docket No. X07-CV-02-0080437 (March 28, 2003) (34 Conn. L. Rptr. 459) (*Sferrazza, J.*); *Beckenstein Enterprises-Prestige Park, LLC* v. *Lichtenstein*, Superior Court, judicial district of Waterbury, Complex Litigation Docket, Docket No. X06-CV-03-0183486 (August 11, 2004) (37 Conn. L. Rptr. 627) (*Alander, J.*); *Horch* v. *United of Omaha Life Ins.*

---

[6] Unlike some jurisdictions, Connecticut has never held that the presumption that a lawyer acquired information which would normally have been imparted in the course of a representation was irrebuttable. See *Bergeron* v. *Mackler*, supra, 225 Conn. 399. Some of the courts which once held the presumption irrebuttable, such as the United States Court of Appeals for the Second Circuit, have come around to allowing the attorney to present evidence to rebut it. See *Miroglio, s.p.a.* v. *Morgan Fabrics Corp.*, 340 F. Sup. 2d 510, 512–13 (S.D.N.Y. 2004).

*Co.*, Superior Court, judicial district of New Haven, Docket No. CV-98-0415821S (July 2, 1999) (25 Conn. L. Rptr. 18) (*Devlin, J.*); *Rivera* v. *Chicago Pneumatic Tool Co.*, Superior Court, judicial district of New London, Docket No. 516364 (August 5, 1991) (6 C.S.C.R. 786) (*Teller, J.*).

### III

The named plaintiff, Juliana Klein, is an infant suing through her mother, coplaintiff Barbara Klein, and alleges that Miller was negligent in divers ways during the delivery of Juliana Klein and that her negligence was responsible for serious and permanent injuries to Juliana Klein. Central's negligence is premised on the claimed negligence of Miller, who is alleged to have been an employee of Central at the time of the delivery. The coplaintiff alleges in the same complaint that she has suffered severe and permanent emotional distress as a result of Miller's and Central's negligence.[7]

Attorney Joyce Lagnese, a partner in the Danaher firm, represents both Miller and Central. She testified that Edwards had done no work on the *Klein* matter, that she had never discussed it with him and that, as far as she knows, he has no substantive knowledge regarding the case. Although the *Klein* matter was discussed at a claims review meeting which Edwards attended in February, 2006, he was not present at that point in the meeting. It is clear from this evidence, as well as the testimony of Edwards himself, that he has no actual knowledge concerning the *Klein* matter, and no client confidences which would be at risk even if he were the attorney in the Stratton firm who was representing Juliana Klein and Barbara Klein.[8]

---

[7] Bristol Hospital, Inc., is also a defendant in the *Klein* matter but has not joined in the motion to disqualify; so, hereinafter in this memorandum of decision, the court will refer to Miller and Central as the defendants.

[8] Lagnese also testified that she had tried a case very similar in its allegations as to negligence, causation and injury in the fall of 2005 before this court. Her client in that case was a partner of Miller's in Central, and Lagnese

The moving party seeking Edwards' disqualification, however, is not Miller or even Central, but Physicians.[9] Physicians was formed in 1997; 51 percent of it is owned by an entity known as Women's Health USA (Women's), and the minority shareholders are the approximately 160 physicians employed in thirty obstetrics and gynecology offices in Connecticut. Central is one of these offices, and Miller is actually an employee of Physicians. One of the purposes in forming this joint venture was to economize on the cost of malpractice insurance coverage. Toward that end, Ark Indemnity Company, a "captive" insurance company, was formed in 2003, funded by premiums paid by the members of Physicians. Another goal was to centralize management services for the member offices, and that has been accomplished through Women's Health CT (Health), which provides billing, collection, contracting, technology, payroll and consulting services to the member offices and physicians.

Paula Greenberg, an employee of Women's, serves as vice president for clinical operations for Health and testified at the hearing on these motions. She affirmed that Edwards was not considered to be Miller's attorney either by Physicians or by Miller. She had had no discussions with him about the *Klein* matter, nor had any other Physicians personnel to her knowledge. She was present at the claims review meeting at which the *Klein* matter and other cases being defended by the Danaher firm were discussed. While other cases involving birth

was assisted by an associate in the Danaher firm with whom Edwards had a close personal relationship. Lagnese knew from statements made to her by the associate that Edwards and she had discussed that case while it was on trial. She was unable to testify as to the content of the discussions between the associate and Edwards; thus, there is nothing in the record to indicate that anything they discussed bears on any of the issues in the *Klein* matter. Edwards testified that he did not learn anything from the associate that could be used against Miller in the *Klein* matter.

[9] The standing of a nonparty to raise the issue of disqualification was not challenged by the Stratton firm.

injuries may have been discussed in Edwards' presence, the *Klein* matter was not, she testified. As far as Greenberg is aware, Edwards knows nothing about the *Klein* matter.

Nevertheless, it is the position of Physicians that Edwards and the Stratton firm must be disqualified from suing not only Miller and Central but any of the 160 physicians and thirty offices which make up Physicians because, while employed at the Danaher firm, he represented twelve physicians who were and are members of Physicians. In that capacity, Greenberg testified, he acquired confidential information concerning Physicians which would be at risk of disclosure if he were to represent persons claiming professional negligence on the part of any of its members. Physicians views itself as a statewide practice group; Edwards' representation of any of its members creates an attorney-client relationship between him and Physicians, it claims, and subsequent representation of a person suing any of Physicians' members puts at risk the confidential information concerning Physicians which Edwards acquired in the course of his earlier representation.

The court has examined the exhibit that is a chart showing Edwards' "time on [Physicians] cases" while at the Danaher firm. Excluding two cases on which he spent a lot of time by any measure,[10] the time spent ranges from one hour to fifty-two hours, with most of the hours spent in the single digit range. One case, Lagnese testified, was a birth injury case in which she briefed Edwards as to strategic issues, and he conducted a mediation. He spent a total of fifteen hours on that case. It appears from this exhibit that Edwards

---

[10] The two were a cervical cancer case on which he spent 388 hours before it was settled and a brain damage case on which he spent ninety-eight hours before it, too, was settled, according to Greenberg. This was before the captive insurance company insuring Physicians' members was in existence.

was involved to one degree or another in three Physicians birth injury cases while at the Danaher firm. There was no evidence, however, demonstrating any similarity between those cases, factually or legally, and the *Klein* matter.

The types of "confidential information" to which Edwards would have been privy were described by Greenberg as the personality types of the member physicians, the pluses and minuses of computer records in discovery and its relationships with specific vendors providing Physicians with expert witnesses. Her testimony was supplemented by that of Matthew Saidel, a physician, a founding member of Physicians and a member of its board of directors. Saidel was also present at the February, 2006 meeting at which Physicians cases being defended by the Danaher firm were discussed; Physicians' claims review philosophy, strategy and process were discussed at that meeting, and he maintained that all of that is confidential.

The testimony of both Saidel and Greenberg make clear the reach and ambition of the motion before the court in the *Klein* matter. If granted, it would preclude the Stratton firm from representing any plaintiff who brings suit against any member of Physicians regardless of the firm's ignorance of confidential information about that physician or the circumstances of that case, all because Edwards previously represented other doctors who were members of Physicians. Saidel testified that there are about 400 physicians actively practicing obstetrics and gynecology in Connecticut. The Stratton firm, therefore, would be disqualified from bringing suit against 40 percent of the obstetrics and gynecology practitioners in the state.

The court has serious questions whether an attorney-client relationship was created between Edwards and Physicians by his representation of one of its members.

When an attorney is employed or retained by an insurance carrier to represent its insured, the attorney-client relationship is between the attorney and the insured, not the carrier. *Goldenberg* v. *Corporate Air, Inc.*, supra, 189 Conn. 509. Likewise, the court is skeptical that the kind of information about Physicians pointed to by Greenberg and Saidel can be considered confidential.[11] Regardless of its counsel's protestations that Physicians' claim review process and litigation strategies are "unique," Physicians' witnesses were unable to identify anything "unique" or even unusual about them.[12] As one court put it: "[I]f insight into a former client's general 'litigation thinking' were to constitute 'relevant privileged information', then disqualification would be mandated in virtually every instance of successive representation. That clearly is not the law . . . ." *Vestron, Inc.* v. *National Geographic Society*, 750 F. Sup. 586, 595 (S.D.N.Y. 1990).[13] The outcome of a case evaluation in a particular case would certainly be confidential, but there is no claim or evidence to support a claim

[11] Counsel for the Stratton firm, both in their posthearing memorandum and in prior filings, have identified both judicial decisions and other resources readily available in the library or over the Internet which discuss the philosophies, strategies, systems, processes and forms used for case evaluation and settlement in medical malpractice cases.

[12] The situation is analogous to that faced by the court in *Cadle Corp.* v. *Ginsberg*, 70 Conn. App. 748, 802 A.2d 137, cert. denied, 262 Conn. 905, 810 A.2d 271 (2002), where the trial court's denial of a motion to disqualify was upheld "absent specific evidence as to the financial information disclosed" by the defendants in a prior legal malpractice case in which the plaintiff's attorney had represented them "and its likely effect on the present trial." Id., 771–72.

[13] The Restatement of The Law Governing Lawyers is to the same effect: "A lawyer might also have learned a former client's preferred approach to bargaining in settlement discussions or negotiating business points in a transaction, willingness or unwillingness to be deposed by an adversary, and financial ability to withstand extended litigation or contract negotiations. Only when such information will be directly in issue or of unusual value in the subsequent matter will it be independently relevant in assessing a substantial relationship." 2 Restatement (Third), The Law Governing Lawyers § 132, comment d (iii), p. 382 (2000).

that Edwards has information concerning the results of any claims review process that might have taken place in the *Klein* matter.[14]

Such an unprecedented expansion of the rules of attorney disqualification would fly in the face of the injunctions found in the commentary to the Rules of Professional Conduct dealing with disqualification of firms and attorneys based on prior representation. For example, the commentary to rule 1.9 of the Rules of Professional Conduct specifically provides that "a lawyer who recurrently handled a type of problem for a former client is not precluded from later representing another client in a wholly distinct problem of that type even though the subsequent representation involves a position adverse to the prior client."[15]

The commentary to rule 1.10 of the Rules of Professional Conduct is more on point and cautions the court that "the rule of disqualification should not be so broadly cast as to preclude other persons from having reasonable choice of legal counsel. . . . [T]he rule of disqualification should not unreasonably hamper lawyers from forming new associations and taking on new clients after having left a previous association. In this connection, it should be recognized that today many lawyers practice in firms, that many to some degree

---

[14] Professors Hazard and Hodes refer to disqualification based on a lawyer's general tactical information and psychological insights into a former client as the "playbook" rationale for disqualification and comment that few courts would disqualify a lawyer today on such grounds unless there is also present "specific factual information that would be put to adverse use."

[15] As pointed out in the posthearing memorandum of law filed by the Stratton firm, this commentary to rule 1.9 of the Rules of Professional Conduct has been amended by the judges of the Superior Court to substitute the word "factually" for the word "wholly," demonstrating that, if the *facts* of the subsequent representation are distinct from the facts of the prior representation, a lawyer may represent a client adverse to a former client even though he has handled the same *type* of problem for the former client. Model Rules of Professional Conduct 1.9, comment (3), p. 38B.

limit their practice to one field or another, and that many move from one association to another several times in their careers. If the concept of imputed disqualification were defined with unqualified rigor, the result would be radical curtailment of the opportunity of lawyers to move from one practice setting to another and of the opportunity of clients to change counsel."

The evidence is uncontroverted that no attorney-client relationship ever existed between Edwards and Miller or Central. Edwards had no opportunity to acquire any confidential information concerning them or the claims filed against them by the Kleins. Even assuming an attorney-client relationship existed between him and Physicians which gave him an opportunity to acquire confidential information other than that concerning the doctors who were his clients,[16] the court concludes from his testimony, as well as the testimony of Greenberg and Saidel, that knowing such information would not give the Stratton firm and the Kleins an advantage in the litigation against Miller and Central. Edwards testified that there was nothing about Physicians' claims strategy and process which was different from the strategy and process of any other insurer with whom he dealt while representing defendants in malpractice cases; there was no evidence to the contrary, and, based on its own experience as a trial judge and a presiding judge, the court finds that assessment credible. Presumably, Physicians evaluates the facts and the law, the skill of the respective lawyers, the jury appeal of the respective parties, the availability of expert witnesses, the financial exposure, the coverage available

---

[16] Obviously, Edwards could not represent a plaintiff in a suit against one of the physicians whom he previously represented. See, e.g., *Uberti* v. *Kutcher*, Superior Court, judicial district of Fairfield, Docket No. CV-03-399908 (December 1, 2003) (36 Conn. L. Rptr. 97) (*Dewey, J.*), where the court disqualified an attorney from representing the plaintiff when he had previously represented the same defendant doctor in a case involving identical surgery and identical issues of standard of care and liability.

and other well-known factors in determining what cases to settle and on what terms and what cases to try.

Finally, it must be remembered that Edwards has and will have no role in the prosecution of the *Klein* matter by the Stratton firm, and, out of an excess of caution, the firm has put in place a careful screening procedure to ensure that any information he might have garnered about Physicians that could remotely be considered confidential and advantageous to the Kleins would not be spread to other attorneys or support staff at the firm. An exhibit introduced at the trial is a memorandum setting forth this procedure and it is signed by every employee of the firm.[17] It not only establishes the general policy of no communication between Edwards and the other employees of the firm regarding the *Klein* matter, but it also describes specific procedures intended to carry into effect the general policy, e.g., storage of files in locked file cabinets to which Edwards would not have a key,[18] and no direct financial benefit to him arising out of the *Klein* matter.[19] Since Edwards started at the Stratton firm, there has been in effect a computer blocking program which prevents him from gaining access to any information stored concerning the *Klein* matter.

Some witnesses at the hearing expressed concern that such an internal screening procedure might not be effective because, while at the Danaher firm, Edwards failed to comply with an internal firm policy restricting his professional interaction with the associate with

[17] The signatures are dated May 30, 2006, one week after Edwards started at the Stratton firm. The memorandum is dated May 23, however, and the court credits the testimony that the terms of the screening were effective and known to the firm's employees from the date he started.

[18] Leaving nothing to chance, the Stratton firm introduced a photograph of the locked file cabinet.

[19] Edwards testified that he is not an equity partner at the Stratton firm and that his compensation is by way of a salary.

whom he had a personal relationship. This policy had been put in place, in the court's opinion, for good and sufficient reason, for the protection not only of the firm but of the associate and, indeed, of Edwards. Edwards admitted to his violation of the firm policy, and this circumstance has given the court some pause. The court is satisfied, however, with Edwards' testimony that he realizes that the screening procedure, unlike the policy regarding his contacts with the Danaher associate, implicates his professional ethical responsibilities and that a violation would subject him not only to termination of his employment but also disciplinary proceedings. In addition, the court will make compliance with the screening procedure an order of the court.

Edwards had no opportunity to and did not acquire confidential information concerning either of the defendants in the *Klein* matter. What information he acquired concerning Physicians as a result of his prior representation of its members cannot be considered confidential, and his knowledge would not "materially advance" the interests of the Kleins even if he, himself, were representing them. He is not representing them, however, and the Stratton firm has met its burden of proving that the screening mechanism it has put in place will prevent the spread of any information which Edwards has acquired. For all these reasons, the motion to disqualify the Stratton firm from representing the Kleins in their action against Miller and Central is denied.

## IV

In the second matter before this court, *Cwikla* v. *Bloom*, the plaintiff has sued the named defendant and his codefendant surgical group, Connecticut Surgical Group (Surgical), for malpractice, claiming that the named defendant was negligent in performing a laparoscopic cholesystectomy and, as a result, the plaintiff

suffered serious and permanent injuries.[20] Attorney Southworth has filed a motion to disqualify the Stratton firm based solely on attorney Edwards' representation of four other surgeons who are members of Surgical, as well as Surgical, itself, while he was employed at the Danaher firm.

The same rules of professional conduct and ethical considerations apply here as in the *Klein* matter. The *Cwikla* matter is certainly not "substantially related" to any of the prior Surgical cases handled by Edwards in the sense that "the relationship between the issues in the prior and present cases is patently clear or . . . the issues are identical or essentially the same." (Internal quotation marks omitted.) *Bergeron* v. *Mackler*, supra, 225 Conn. 399.[21]

The claim is similar to that made in *Klein*; viz., by virtue of his representation of Surgical and members of the group in prior cases he has been privy to information about the group and its approach to evaluating cases for purposes of trial or settlement.

There is no dispute that Edwards has never represented the named defendant. Nor did he and the named defendant, who was the chairperson and chief executive officer of Surgical from January, 1995, to February, 2006, communicate about any of the other Surgical cases handled by him. His prior representation of Surgical, itself, was always in a vicarious capacity, i.e., where it was alleged to be liable solely because the physician

---

[20] Hartford Hospital is also a defendant in this action but has not joined in the motion to disqualify. Hereinafter, therefore, where the court refers to "the defendants," it means the named defendant and Surgical.

[21] There seems to be a suggestion in Surgical's posthearing memorandum that at least some of the surgical procedures involved in Edwards' prior Surgical cases and the procedure performed on the plaintiff are substantially related, but the only thing even similar about them, as far as the court can tell from the evidence, is that they involved the same part of the anatomy, the abdomen.

performing the procedure was allegedly negligent. None of the complaints in those cases alleged institutional or corporate negligence on the part of Surgical. They did not, therefore, require Edwards to obtain confidential information about the internal policies and procedures of Surgical, which might give him an advantage in subsequent litigation against Surgical as an institution. The *Cwikla* matter contains no allegations of institutional or corporate negligence against Surgical.[22]

Attorney Neil Danaher, a partner in the Danaher firm, testified that in Surgical cases there was a "more substantive exchange" among the group, its insurers and the attorney representing the physician-member than was normal with other groups and insurers, and that Edwards would know this from his prior representations. The named defendant swore in an affidavit that was admitted into evidence that it was "understood" that Surgical's "systems and procedures utilized to manage, evaluate and try or resolve claims and lawsuits" were confidential and would not be used by attorneys suing Surgical and its member physicians. As was the case with Physicians, however, no evidence was adduced to show what was confidential about these "systems and procedures" or what "confidential inside information" Edwards had that would give him an advantage in subsequent litigation against Surgical, such as the *Cwikla* matter. Edwards testified that there was nothing distinctive or unusual about the "systems and procedures" employed by Surgical to evaluate cases

---

[22] In *Crawford W. Long Memorial Hospital* v. *Yerby*, 258 Ga. 720, 373 S.E.2d 749 (1988), the plaintiff's attorney in a malpractice action against a hospital had represented the hospital in eighteen malpractice suits, thereby learning much about its "practices, policies, procedures [and] reporting requirements . . . ." Id., 721. Still, the court disqualified him not because it found a substantial relationship between those cases and the new plaintiff's case but because of an "appearance of impropriety," a provision of the Code of Professional Responsibility not carried over into Connecticut's Rules of Professional Conduct. Id., 722.

for trial or settlement. These processes are well-known among the members of the bar trying such cases and are used both by attorneys and insurers on the defense side and by plaintiffs' attorneys as well, he testified, and no evidence was introduced to the contrary.[23]

The *Cwikla* matter is different from the *Klein* matter in that in the former, one of the defendants, Surgical, is actually a prior client of Edwards, but Surgical has failed to carry its burden of proving that Edwards' prior representation of it or its members gave him an opportunity to acquire confidential information which is at risk of disclosure to the disadvantage of the defendants in Edwards' representation of the plaintiff in *Cwikla*. The motion to disqualify Edwards and the Stratton firm in that case is, therefore, denied.

## V

## CONCLUSION

The plaintiffs in both the *Klein* and *Cwikla* matters have chosen the Stratton firm to represent them. Unless the firm would violate rule 1.10 (b) of the Rules of Professional Conduct by continuing to do so, that choice must be respected. See *Bergeron* v. *Mackler*, supra, 225 Conn. 397–98. Although their cases are of the same type as Edwards handled at the Danaher firm, the issues are not "identical or essentially the same." Model Rules of Professional Conduct 1.9, comment (3), p. 38B. Nor is there a "substantial risk that confidential factual information as would normally have been obtained in [Edwards'] prior representation would materially advance [their] position in the subsequent matter." Id. The *Klein* and *Cwikla* matters, therefore, are not "substantially related" to any of the concerns handled by Edwards while he was employed at the Danaher firm, and the Stratton firm need not be disqualified in either instance. See id.

---

[23] See footnote 11.

Accordingly, the motions to disqualify in both the *Klein* and the *Cwikla* matters are denied.

It is further ordered that Edwards adhere strictly to the screening procedure put in place by the Stratton firm regarding the *Klein* matter and introduced into evidence as an exhibit and that, in particular, he have no communication with any member or employee of the Stratton firm about the *Klein* matter, that he absent himself whenever any such discussion should occur, that he not read any documents relating to that matter or obtain access to any computer stored information pertaining to it.